GRAY–JONES, Appellant,

v.

JONES et al., Appellees.*

GRAY–JONES, Appellant,

v.

ENERGY MARKETING SERVICES, INC. et al., Appellees.

[Cite as *Gray–Jones v. Jones* (2000), 137 Ohio App.3d 93.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 98AP–1372 and 98AP–1373.

Decided March 23, 2000.

*Peter F.J. Beagle,* for appellant.

*Kegler, Brown, Hill & Ritter Co., L.P.A.,* and *John P. Brody,* for appellees Energy Marketing Services, Inc. and Albin A. Strohen.

KENNEDY, Judge.

Appellant, Janet M. Gray–Jones, appeals from a decision and final judgment entry of the Franklin County Court of Common Pleas awarding judgment against appellant in favor of appellees, Energy Marketing Services, Inc. ("EMS"), Jeffrey A. Jones ("Jones"), and Albin A. Strohen ("Strohen").

Appellant filed two complaints on July 29, 1996, alleging that she was wrongfully discharged as a director, officer, and employee of EMS, and a shareholder derivative action. Appellees counterclaimed, alleging that appellant tortiously interfered with the sale of EMS's assets to UtiliCorp Energy Services ("Utili-

Corp"), and sought damages based on appellant's conduct. The two actions were consolidated for trial. In an entry filed September 24, 1997, the trial court dismissed appellant's employment discrimination claim as a sanction for failure to comply with discovery orders. On February 17, 1998, the trial court granted appellees' partial summary judgment motion, finding that appellant withdrew as a shareholder of EMS effective September 19, 1996. The trial was held March 9 to March 18, 1998. At the conclusion of the trial, the trial court sustained appellees' directed verdict motion against appellant on her shareholder derivative action, finding that the action could not be maintained because appellant withdrew from EMS on September 19, 1996.

In a decision and judgment entry filed May 11, 1998, the trial court found that appellant was not wrongfully terminated by appellees because they had legitimate business reasons for her termination, that appellant's shares in EMS were worth $221,400, that appellees were entitled to recover damages from appellant in the amount of $3,000,000 for her tortious interference with the sale of EMS's assets to UtiliCorp, that appellees were entitled to recover attorney fees from appellant in relation to the frivolous shareholder derivative action, the partial summary judgment motion, and the tortious interference claim, and that appellant should be punished for her malicious behavior by an award of punitive damages to appellees. The trial court held a separate hearing to determine the amount of attorney fees to be awarded as compensatory damages and to determine the amount of punitive damages. In a final judgment entry filed September 30, 1998, the trial court awarded appellees $454,517 in attorney fees and $454,517 in punitive damages. Appellant filed timely notices of appeal.

On appeal, appellant raises eight assignments of error:

*Assignment of Error I:*

"The trial court erred in awarding compensatory damages to EMS because there was no showing of damages for tortious interference with a prospective contractual relationship."

*Assignment of Error II:*

"The trial court erred in holding that Gray tortiously interfered with a business relationship."

*Assignment of Error III:*

"Advice of counsel regarding the actions of a party cannot rise to the level of improper interference with a contract."

*Assignment of Error IV:*

"The trial court erred in awarding judgment to the defendants since they failed to mitigate their damages."

*Assignment of Error V:*

"The trial court erred in finding that Gray's stock had a value of only $221,400.00."

*Assignment of Error VI:*

"The court erred in finding that plaintiff was not wrongfully terminated."

*Assignment of Error VII:*

"The trial court erred in finding that EMS had a legitimate business reason to terminate Gray."

*Assignment of Error VIII:*

"The trial court erred in awarding $454,517 in attorney fees."

Appellant and appellee Jones, who were married at the time, formed EMS in 1988 as a subchapter S Corporation operating as a broker of natural gas. Appellant and Jones each owned fifty percent of the one hundred shares of EMS stock, and both were signatories to a shareholders' agreement effective August 1, 1988. Appellant served as chief executive officer of EMS, while Jones served as president and treasurer. Strohen, the brother-in-law of appellant, was an employee of EMS, serving as vice president. In 1994, appellant and Jones entered into an agreement with Strohen ("Strohen agreement") whereby he acquired five shares from each of them, for a total ownership of ten percent of the shares of EMS. This agreement was executed on July 26, 1994, although the transfer was effective as of April 27, 1994. Subsequently, on July 20, 1995, appellant, Jones, and Strohen entered into an agreement under which Strohen agreed to be bound by the provisions of the 1988 shareholders agreement.

Beginning in 1995, the parties discussed the possibility of selling the natural gas marketing assets of EMS. The parties designated Jones to pursue a sale of assets to UtiliCorp. Early in 1996, appellant quit coming into work and was placed on a leave of absence with full pay and benefits. Strohen maintained regular contact with appellant and kept her informed of the progress of the negotiations with UtiliCorp.

In May 1996, UtiliCorp expressed an interest in purchasing EMS's assets for a price between $3 and $4 million, depending on several factors. By letter dated May 9, 1996, Jones wrote to appellant to inform her that the sale could close as early as July, that the price was between $3 and $4 million, and that EMS was selling only its natural gas marketing assets and not its equity. UtiliCorp's counsel sent EMS copies of form contracts they had utilized in the past, as well as a due diligence check list and other documents. The parties signed a joint action by shareholders without a meeting on June 28, 1996, indicating that they were willing to sell EMS's assets to UtiliCorp, but the resolution did not actually

obligate them to sell the assets. In a letter dated June 28, 1996, UtiliCorp made a nonbinding offer to purchase EMS's assets with a final purchase price target of $4 million with adjustments. Jones sent a copy of this letter to Strohen, who sent the letter, as well as an analysis prepared by him, to appellant.

UtiliCorp scheduled due diligence with EMS for July 29, 1996. The parties attended a breakfast meeting at Bob Evans restaurant on July 24, 1996, to discuss the sale to UtiliCorp. Jones explained the negotiations with UtiliCorp and the parameters of the sale. Appellant demanded that they immediately agree in writing that she would receive forty-five percent of the sale proceeds and that she be allowed to walk away from EMS without any further liability or responsibility. When Jones and Strohen would not agree to her terms, appellant threatened to disrupt the due diligence and to kill the deal with UtiliCorp. Jones told appellant that he would contact counsel to determine if appellant could be fired to prevent her from disrupting the negotiations with UtiliCorp. Appellant visited EMS's offices that night and removed documents from the office, and, later that evening, she called EMS employee Randy Feucht and fired him. Feucht reported his firing to Jones and Strohen on the morning of July 25, 1996.

Jones and Strohen called a telephonic board meeting on July 26, 1996, and appellant and her counsel participated in the meeting. Jones and Strohen fired appellant as an officer and employee of EMS, effective immediately, and instructed her not to interfere with EMS's business and to stay away from the office. Because appellant asserted that she had not received proper notice of the board meeting, Jones and Strohen scheduled a second board meeting for July 29, 1996, to ratify the actions taken at the July 26 board meeting. Later, on the afternoon of July 26, 1996, appellant made a visit to EMS's office during which she had an altercation with Randy Feucht. At the July 29, 1996 board meeting, Jones and Strohen again voted to terminate appellant and to bar her from interfering with the business of EMS. Appellant then filed the two actions against appellees.

The due diligence with UtiliCorp proceeded without any obstacles to the sale arising. Jones informed UtiliCorp of appellant's lawsuits. UtiliCorp's counsel sent a letter to EMS on August 29, 1996, indicating that the sale could not conclude until the shareholders of EMS resolved their differences and until appellant's lawsuits were dismissed with prejudice. A copy of this letter was provided to appellant's counsel, who responded by refusing to dismiss the lawsuits. Jones and Strohen then were forced to discontinue efforts to sell EMS's assets to UtiliCorp. Steven Cochennet, the UtiliCorp employee in charge of the negotiations with EMS, indicated that UtiliCorp was ready and willing to proceed with the sale, but that appellant's litigation was the sole reason that the sale did not occur. On September 19, 1996, appellant issued notice, pursuant to

the terms of the shareholder agreement, to withdraw from EMS and to have her shares redeemed.

Appellant's first and second assignments of error both concern the trial court's finding of intentional interference with contractual relations, so we address them together. In appellant's second assignment or error, she argues that the trial court erred in holding that appellant tortiously interfered with a business relationship. In appellant's first assignment of error, she argues that the trial court erred in awarding compensatory damages to EMS because there was no showing of damages for tortious interference with a prospective contractual relationship. We disagree.

■ Appellant concedes that the trial court correctly recited the elements of tortious interference with a contractual relationship delineated by the Supreme Court of Ohio in *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863, paragraph two of the syllabus. However, appellant argues that her actions did not amount to interference with a contractual relationship and were not improper. In addition, she argues that EMS failed to prove damages because EMS was only selling its natural gas marketing assets to UtiliCorp, which it retained when the sale did not go forward, and that there was no evidence presented that these assets were somehow devalued. Thus, appellant essentially is arguing that the trial court's findings of intentional interference and damages are against the manifest weight of the evidence. As the Supreme Court of Ohio has held, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

■ In *Kenty*, the Supreme Court of Ohio adopted Restatement of the Law 2d, Torts (1979) 20, Section 766, and provided the elements of the tort of intentional interference with a contract: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Id.*, 72 Ohio St.3d at 419, 650 N.E.2d at 864. As the trial court noted, Ohio law also recognizes the tort of intentional interference with a prospective contractual relationship. See, *e.g.*, *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 14, 651 N.E.2d 1283, 1294. Restatement of the Law 2d, Torts (1979) 20, Section 766B, concerning intentional interference with prospective contractual relations, provides:

"One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other

for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

"(a) inducing or otherwise causing a third person not to enter into or continue a prospective relation or

"(b) preventing the other from acquiring or continuing the prospective relation."

Comment *c* to Restatement of the Law 2d, Torts (1979) 20, Section 766B, indicates that the type of relations protected from interference under this section includes "any prospective contractual relations * * * if the potential contract would be of pecuniary value to the plaintiff." Additionally, Comment *c* provides that prospective contractual relations include "the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts."

To determine whether an individual's interference with another's contract was improper under the fourth factor of the *Kenty* test (lack of justification), the Supreme Court of Ohio has adopted Restatement of the Law 2d, Torts (1979) 26, Section 767, which provides a list of factors for a court to consider. *Fred Siegel Co., L.P.A. v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 178–179, 707 N.E.2d 853, 860–861. The Supreme Court of Ohio indicated:

"In determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Id.* at paragraph three of the syllabus (citing Restatement of the Law 2d, Torts [1979] 26, Section 767.)

With regard to damages for intentional interference with a prospective contractual relationship, Restatement of the Law 2d, Torts (1979) 54, Section 774A(1) provides:

"(1) One who is liable to another for interference with a contract or a prospective contractual relation is liable for damages for

"(a) the pecuniary loss of the benefits of the contract or the prospective relation;

"(b) consequential losses for which the interference is a legal cause; and

"(c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."

■ Comment *b* to Section 774A explains that, when the interference was with a prospective contract, the plaintiff is entitled to recover the lost profit expected to be made under the contract. Additionally, Ohio law recognizes that a plaintiff may recover all damages proximately caused by an actor's misconduct in a tortious interference action. See, *e.g., Brookeside Ambulance, Inc. v. Walker Ambulance Serv.* (1996), 112 Ohio App.3d 150, 157–158, 678 N.E.2d 248, 252–253.

■ The trial court made extensive findings in determining that appellant's conduct amounted to intentional interference with the sale of EMS's assets to UtiliCorp. EMS clearly had a prospective contractual relationship with Utili-Corp, and appellant was fully aware of this prospective relationship. Appellant set out on a course of conduct designed to kill the deal with UtiliCorp when Jones and Strohen would not acquiesce to her demands. Appellant's interference was improper, amounted to an abuse of process, and was a violation of her fiduciary duty as a shareholder in a close corporation. EMS, Jones, and Strohen lost a transaction worth $3 million because of appellant's actions. These findings are fully supported by the record. Moreover, the trial court found that appellant's testimony regarding her version of the events was not credible. As the Supreme Court of Ohio has instructed, the credibility of witnesses is a question for the trier of fact and not for a reviewing court to determine. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 81, 10 OBR 408, 411–412, 461 N.E.2d 1273, 1277

Appellant argues that her filing of the lawsuits was justified to protect her interest in EMS and that her actions were cloaked by a qualified privilege. However, the trial court conducted a thorough analysis under the factors of Restatement of the Law 2d, Torts (1979) 26, Section 767, which the Supreme Court of Ohio adopted in *Fred Siegel,* and concluded that appellant's actions were improper and not protected by qualified privilege.

■ Additionally, the trial court found that appellant had committed the tort of abuse of process. Appellant's motive in filing the lawsuits was to gain leverage to force Jones and Strohen to give her forty-five percent of the assets of the sale without any future liability to EMS. Appellant's actions were for personal gain and in violation of her fiduciary duty as a shareholder under R.C. 1701.59(B). The evidence of appellant's later actions, such as leaving harassing and threatening telephone messages for Jones and Strohen and having Huntington Bank suspend EMS's line of credit, is admissible under Evid.R. 404(B) to show her intent and motive. *State v. D.J. Master Clean, Inc.* (1997), 123 Ohio App.3d 388, 393, 704 N.E.2d 301, 304; *State v. Banks* (1986), 31 Ohio App.3d 57, 61, 31 OBR 97, 100–101, 508 N.E.2d 986, 990–991. These actions by appellant demonstrate that she was motivated by actual malice. Again, these findings by the trial court are fully supported by the record.

Moreover, appellant's argument that EMS, Jones, and Strohen suffered no damages because the assets of EMS were not devalued is spurious. EMS and its shareholders lost a transaction that the trial court valued at $3 million. The nature of the natural gas industry changed so that a similar sale to another purchaser was not possible. Both Restatement of the Law 2d, Torts (1979) 54, Section 774(A) and Ohio law allow damages for the value of the lost contract in an intentional interference action. The trial court's award of compensatory damages is fully supported by the record.

Therefore, there is competent, credible evidence going to all of the essential elements of the intentional interference finding as well as the award of compensatory damages. Thus, the trial court's conclusions on these issues are not against the manifest weight of the evidence. Consequently, appellant's first and second assignments of error are overruled.

In appellant's third assignment of error, she argues that advice of counsel regarding the actions of a party cannot rise to the level of improper interference with a contract. In her fourth assignment of error, she argues that the trial court erred in awarding judgment to defendants since they failed to mitigate their damages. Appellees argue that these arguments are waived because they were raised for the first time on appeal. The Supreme Court of Ohio has recognized that the rule that issues presented for the first time on appeal are waived is "deeply embedded in a just regard for the fair administration of justice." *State ex rel. Quarto Mining Co. v. Foreman* (1997), 79 Ohio St.3d 78, 81, 679 N.E.2d 706, 709. Our review of the record indicates that these issues were not raised before the trial court, so they are waived. Therefore, appellant's third and fourth assignments of error are overruled.

In appellant's fifth assignment of error, she argues that the trial court erred in finding that her stock had a fair market value of only $221,400. We agree.

Appellant issued notice on September 19, 1996, that she was withdrawing from EMS and requested that her shares in EMS be redeemed. Both parties agree that the shareholders' agreement, effective August 1, 1988, is controlling in determining the value of appellant's forty-five shares of EMS stock. The trial court found that the shareholders' agreement was ambiguous, that the parties intended that the shares of a withdrawing shareholder be valued at their fair market value, and that two discounts, a minority shareholder discount and a marketability discount, should be applied to obtain the value of appellant's shares. The trial court relied on the interpretation of appellees' expert witness, David Kiesling, who prepared a "Report on Valuation as of October 31, 1996." Kiesling's interpretation was that the shareholders' agreement required that the "fair

market value" of the shares be determined and that intrinsic in the term "fair market value" for the shares of a closely held corporation are discounts for marketability and minority ownership. The trial court also relied on the Strohen agreement, executed on July 26, 1994, which had applied discounts for minority ownership and marketability. Appellant argues that no discounts should have been applied under the terms of the shareholders' agreement.

Paragraph VI of the shareholders' agreement provides that "[a]ny Shareholder may at any time request * * * the Corporation to redeem his stock and to resign from corporate activities by giving thirty * * * days oral or written notice prior to such withdrawal." Upon withdrawal of a shareholder, the stock is to be redeemed "on the same terms and conditions as if the withdrawing Shareholder had died on the date of withdrawal; provided, however, that payments shall be made in sixty (60) equal monthly installments." Paragraph IV of the shareholders' agreement concerns stock redemption. Paragraph IV(C) provides:

"The purchase price shall be as determined by the Shareholders at the annual meeting and noted on 'Schedule A' attached hereto as an Exhibit. In the event the Shareholders shall fail to meet and/or agree in writing as to the purchase for a period of twelve (12) months, then the price shall be determined as follows:

"1. Value of the shares of the Shareholder, as determined by the Corporation's Certified Public Accountant as at the last day of the month following the date of death or notice. In determining such value, the Corporation's Certified Public Accountant shall utilize the generally accepted accounting principles applied on a basis consistent with prior periods' determinations.

"2. The value of the shares as determined under Sub–Paragraph 1 above, shall reflect the ratable share of the fair market value of assets of the Corporation as a going business, provided, however, that in making determinations of value, accounts receivable over one hundred twenty (120) days shall be valued at zero (0)."

Contrary to the trial court's finding, we find that the language of the shareholders' agreement is clear and unambiguous.

The interpretation of a contract that is clear and unambiguous is a question of law, and no issue of fact exists to be determined. *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379–1380; *Davis v. Loopco Industries, Inc.* (1993), 66 Ohio St.3d 64, 66, 609 N.E.2d 144, 145–146. Questions of law are reviewed *de novo. Wiltberger v. Davis* (1996), 110 Ohio App.3d 46, 51–52, 673 N.E.2d 628, 631–632. A court may make a factual determination of intent or reasonableness to supply a missing contract term only when a term cannot be determined from the four corners of a contract. *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio

St.3d 321, 322, 15 OBR 448, 448–449, 474 N.E.2d 271, 272–273. When reviewing contract language, courts are required to give plain language its ordinary meaning and may not read language or terms into a contract. *Miller v. Marrocco* (1986), 28 Ohio St.3d 438, 439, 28 OBR 489, 490–491, 504 N.E.2d 67, 69; *Herder v. Herder* (1972), 32 Ohio App.2d 75, 76–77, 61 O.O.2d 62, 63–64, 288 N.E.2d 213, 215–216.

Under Paragraph IV(C) of the shareholders' agreement, the purchase price for shares was to be determined by the shareholders at the annual meeting. However, it is undisputed that the price was never determined at any annual meeting. Thus, Subparagraphs IV(C)(1) and (2) apply to determine the price. Under Subparagraph IV(C)(1), EMS's certified public accountant is to determine the value of the shares as of the last day of the month following notice of withdrawal. Here, the valuation was determined as of October 31, 1996. The corporation's CPA is instructed to utilize generally accepted accounting principles applied consistent with prior periods' determinations. However, Robert Irwin, EMS's certified public accountant, refused to perform the valuation because he felt that he was not qualified. Appellees' expert testified that the use of the term "generally accepted accounting principles" is not relevant to a valuation. Also, as previously indicated, there were no prior determinations to serve as a basis for the valuation of appellant's shares.

The trial court's reliance on the Strohen agreement as a prior determination to serve as a basis for the valuation of appellant's shares is misplaced and not supported by the record. The testimony of both experts and Irwin, as well as a comparison of the Strohen agreement to the shareholders' agreement, all indicate that the Strohen agreement was a sale of shares outside the shareholders' agreement. It was not a redemption or a sale as provided under the terms of the shareholders' agreement. Further evidence is the July 20, 1995 agreement between appellant, Jones, and Strohen, whereby Strohen specifically agreed to abide by the terms of the shareholders' agreement. Thus, the Strohen agreement cannot serve as a "prior determination" for the basis of a valuation of appellant's shares. Additionally, the testimony of attorney A.C. Strip, who drafted the Strohen agreement, indicates that the two discounts in the Strohen agreement were included to reduce the price of the shares to reward Strohen for past service and to allow appellant to give five shares to Strohen without incurring gift tax. Although the trial court found that appellant's statement that they pulled the price out of the air was not credible, the testimony that the price was reduced to reward Strohen and to allow appellant to give her shares to Strohen is supported by independent evidence. For example, it is undisputed

that appellant did subsequently give her shares to Strohen. Consequently, the trial court's use of the Strohen agreement as a prior determination for the basis of valuing appellant's shares was erroneous.

Thus, Subparagraph IV(C)(2) is the only portion of the shareholders' agreement that is controlling as to the valuation of appellant's shares. Subparagraph IV(C)(2) states that the value of the shares "shall reflect the ratable share of the fair market value of the assets of the Corporation as a going business." According to Richard Ferguson, appellant's witness whom the court qualified as an expert in valuations, the only discount provided in the shareholders' agreement is that accounts receivable over one hundred twenty days old are to be valued at zero under Subparagraph IV(C)(2). Ferguson's interpretation was to take the fair market value of the assets, which the parties stipulated was $1,720,000, and to multiply that by forty-five percent, which is appellant's share of the stock, resulting in appellant's shares having a value of $774,000. Interestingly, this approach was also suggested by Jones in a draft of a letter to appellant dated March 27, 1996, in which he recommended that EMS purchase her stock for forty-five percent of the equity of the corporation with no mention of discounts. Kiesling's interpretation of the same language was to find the fair market value of the shares; however, as he acknowledged on cross-examination, the specific language of the shareholders agreement states "the fair market value *of the assets.*" (Emphasis added.) Thus, Kiesling's interpretation requires reading language into the shareholders' agreement, contrary to the holdings of *Miller* and *Herder.* Kiesling also testified that the other basis for applying the discounts is that the shareholders' agreement in Subparagraph IV(C)(2) uses the word "reflect" instead of "equals" to describe the relationship between the value of shares and the fair market value of the assets. However, this interpretation is inconsistent with the ordinary meaning of the word "reflect."

We agree with Ferguson's interpretation that no discounts are provided for in the shareholders' agreement, other than for accounts receivable over one hundred twenty days old. This interpretation is required by the clear and unambiguous language of Subparagraph IV(C)(2) of the shareholders' agreement. Thus, the trial court erred in interpreting the agreement and in finding that the value of appellant's shares was $221,400 instead of $774,000. Consequently, appellant's fifth assignment of error is sustained.

We address appellant's sixth and seventh assignments of error together, since both concern her termination from EMS. In appellant's sixth assignment of error, she argues that the trial court erred in finding that she was not wrongfully terminated. In her seventh assignment of error, she argues that the

trial court erred in finding that EMS had a legitimate business reason to terminate her. We disagree.

Appellant served as chief executive officer and as secretary of EMS. However, she did not come to work at all beginning in January and February 1996, due to health problems. Appellees placed appellant on a leave of absence but continued her salary, distributions, and benefits. Appellees terminated appellant at a board meeting on July 26, 1996, and later ratified this action at a second board meeting held on July 29, 1996, due to concerns over appellant's notice of the first meeting. The trial court found that appellant was terminated by EMS because she had threatened to disrupt due diligence with UtiliCorp and because she had unjustifiably fired Randy Feucht, a key EMS employee. The trial court also found that appellant was an at-will employee under Ohio law and EMS's Code of Regulations. However, the trial court concluded that, even if appellant were not an at-will employee, she was not wrongfully terminated because EMS had a legitimate business reason for her termination.

Appellant appears to be arguing indirectly that she was wrongfully terminated by EMS due to an alleged disability. However, as appellees point out, appellant is attempting to resurrect her disability discrimination claim that the trial court dismissed with prejudice as a sanction for failure to comply with a discovery order. Appellant did not raise the dismissal of her disability discrimination claim as an assignment or error, so it is waived. Moreover, the record clearly supports the trial court's finding that appellant was justifiably terminated for threatening to disrupt the sale of assets to UtiliCorp and for firing Feucht.

The trial court correctly cited Ohio law, recognizing two exceptions to the doctrine of employment at will for express or implied employment contracts and for promissory estoppel. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 103–105, 19 OBR 261, 263–265, 483 N.E.2d 150, 153–155. The record supports the trial court's conclusion that appellant failed to prove the existence of an express or implied employment contract, or to satisfy the elements of promissory estoppel. Contrary to appellant's argument, nothing in her separation agreement or the letter placing her on a paid leave of absence creates an employment contract or any promise that would serve as a basis for promissory estoppel. Although appellees owed a heightened fiduciary duty to appellant due to her status as a minority shareholder in a close corporation, they terminated appellant for a legitimate business reason pursuant to Article III, Section 4 of the Amended and Restated Code of Regulations of EMS, which allows the removal of corporate officers at any time with or without cause. Consequently, appellant's sixth and seventh assignments of error are overruled.

In appellant's eighth assignment of error, she argues that the trial court erred in awarding $454,517 in attorney fees. We disagree.

The trial court awarded attorney fees to appellees under R.C. 2721.09 for their motion for partial summary judgment, which was a declaratory judgment action. Additionally, the trial court awarded appellees attorney fees as compensatory damages for the legal expenses they incurred in defending against appellant's lawsuits, which the trial court found were an abuse of process, and for their litigation against Lloyd Dalton. Thus, the trial court awarded appellees a total of $454,517 in attorney fees. Additionally, the trial court awarded appellees $454,517 in punitive damages for appellant's intentional and malicious conduct. Appellant argues that the attorney fee award should have been limited to the motion for partial summary judgment. However, appellant makes no argument on appeal as to the award of punitive damages.

Ohio follows the longstanding "American rule" on attorney fees that a prevailing party may not recover attorney fees absent statutory authority or a finding of conduct that amounts to bad faith. *Krasny–Kaplan Corp. v. Flo–Tork, Inc.* (1993), 66 Ohio St.3d 75, 77, 609 N.E.2d 152, 153–154; *Vance v. Roedersheimer* (1992), 64 Ohio St.3d 552, 556, 597 N.E.2d 153, 156–157. In *Motorists Mut. Ins. Co. v. Brandenburg* (1995), 72 Ohio St.3d 157, 648 N.E.2d 488, syllabus, the Supreme Court of Ohio held that "[a] trial court has the authority under R.C. 2721.09 to assess attorney fees based on a declaratory judgment issued by the court." A trial court's award of attorney fees will not be reversed on appeal absent an abuse of discretion. *Id.; Gates Mills v. Jones* (1994), 95 Ohio App.3d 341, 346, 642 N.E.2d 444, 447. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 218, 5 OBR 481, 481–482, 450 N.E.2d 1140, 1141.

Here, appellant does not dispute the award of attorney fees under R.C. 2721.09 related to the partial summary judgment motion, and, under the Ohio Supreme Court's decision in *Motorists*, the award was proper. Although appellant argues that the trial court's award of the entire amount of appellees' attorney fees was erroneous, the trial court's implicit finding that appellant acted in bad faith supports the award. As discussed in relation to appellant's first and second assignments of error, the trial court found that appellant's actions amounted to an abuse of process and a breach of her fiduciary duty as a shareholder. Appellant threatened to kill the deal with UtiliCorp to gain leverage and to force appellees to acquiesce to her demands. Again, these findings are fully supported by the record. Consequently, the trial court did not abuse its discretion in awarding

appellees their entire amount of attorney fees. Appellant's eighth assignment of error is overruled.

Based upon the foregoing reasons, appellant's first, second, third, fourth, sixth, seventh, and eighth assignments of error are overruled, while appellant's fifth assignment of error is sustained. Thus, the judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

PETREE, J., concurs.

DESHLER, J., concurs in part and dissents in part.

DESHLER, Judge, concurring in part and dissenting in part.

While I agree with the majority in most respects, I must respectfully dissent from the majority's affirmance of the trial court's award of attorney fees.

The trial court awarded appellees $454,517 in attorney fees. The award of fees, if confined to the partial summary judgment procedure, pursuant to R.C. 2721.09, would be sustainable. However, fees generated for other work relating to the case would not be awardable. There does not appear to be any distinguishing of fees incurred relating to partial summary judgment and other fees generated by the litigation between the parties. The gross award of fees is therefore in error. I would therefore sustain appellant's assignment of error regarding the award of attorney fees. In all other respects, I agree with the majority's treatment of the various assignments of error.