[Cite as *Snyder v. Northcoast Research Holdings, L.L.C.*, 2023-Ohio-612.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

ED SNYDER, JR., :

    Plaintiff-Appellee, :

                            111632

    v. :

NORTHCOAST RESEARCH : HOLDINGS, LLC,

    Defendant-Appellant :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 2, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-941506

---

### *Appearances:*

Witschey Witschey & Firestine Co., LPA, Frank J. Witschey, and Jay E. Krasovec, *for appellee*.

McDonald Hopkins LLC, Richard H. Blake, Thomas T. Lampman, and Karina R. Conley, *for appellant*.


ANITA LASTER MAYS, A.J.:

{¶ 1} Defendant-appellant Northcoast Research Holdings, LLC ("Northcoast") appeals the trial court's grant of summary judgment in favor of plaintiff-appellee Ed Snyder, Jr. ("Snyder"). We affirm the trial court's judgment.

## I.  Background and Facts

{¶ 2}  The issue in this breach-of-contract action is whether Snyder, as a Class C unit employee-member of Northcoast "is entitled to a 'put option' under the terms of the Operating Agreement" defined below.  Journal entry No. 122790324, p. 2 (Apr. 18, 2022).  Northcoast explains that a put option allows the holder to compel Northcoast to repurchase the holder's membership units.

{¶ 3}  Northcoast is an Ohio limited liability company based in Cleveland. Northcoast provides investment research and diversified investment management services to institutional broker-dealers of publicly traded securities.  On June 1, 2009, original members Martini Rizzo ("Rizzo") and Ancora Partners, LLC, ("Ancora") entered into the Amended and Restated Operating Agreement of Northcoast Research Holdings, LLC, pursuant to Northcoast's Amended and Restated Operating Agreement ("Original Agreement").[1]  The agreement sets forth the rules, structure and operation of the business, and the rights and obligations of member owner interests.

{¶ 4}  The initial capitalization clause, Article 3.1, provides that Ancora contributed $125,000 for 50 Class A membership units that constituted a 12.5 percent interest in the company.  Rizzo is listed as the holder of 50 Class C units for a $125,000 contribution, an 87.5 percent interest in the company.  The parties

---

[1] Owners of limited liability companies are known as members.  R.C. 1705.01(G). A membership interests "means a member's share of the profits and losses of a limited liability company and the right to receive distributions from that company." R.C. 1705.01(H).

anticipated additional contributions by prospective members who would pay the same purchase price per Class C unit as paid by Rizzo, for an anticipated total capital of $1,000,000. There were no holders of the Class B units. Pursuant to Article 3.2, the board of managers at its discretion had the right to offer certain employees of Northcoast, and a nonparty Northcoast-owned company, the opportunity to purchase Class B units under the terms set forth in Article 3.

{¶ 5} On September 21, 2009, the parties entered into the First Amended Restated Operating Agreement ("First Amendment") (the Original Agreement and First Amendment are collectively referred to as the "Operating Agreement.") The initial capitalization clause is restated in its entirety. Capitalization is "to be completed on or before October 21, 2009 to Rizzo and a select group of principals who have indicated their intention to purchase Class C Units." Also, "[e]ach prospective purchaser shall be offered 60 Units at $150,000 each. Ancora and Rizzo will increase their initial capital contributions to $150,000." The number of Class B units is zero, however, the amendment adds authority to issue 60 Class B units.

{¶ 6} Snyder is an Ohio resident who specializes in data collection and research of certain business sectors and companies engaged in those sectors. Snyder stated Northcoast was interested in his expertise and business portfolio in the dental industry. Snyder and several other specialists in various business sectors entered into separate joinder agreements with Northcoast in October 2009 to become employee-owners. The joinder agreements entitled each signee to 60 Class C units of membership in Northcoast for an investment of $150,000 each.

**{¶ 7}** The two-paragraph joinder agreement provides:

The undersigned hereby acknowledges and agrees that the 60 Class C units of membership interests of NorthCoast Research Holdings, LLC, an Ohio limited liability company (the "Company"), being purchased by the undersigned are subject to the terms and conditions of an Operating Agreement dated as of May 1, 2009 [sic], and First Amended & Restated Operating Agreement dated as of October ____, 2009 (the "Operating Agreement") by and among the Company and its members. The undersigned acknowledges receipt of an execution copy of the Operating Agreement and further acknowledges that the undersigned has read the Operating Agreement and understands its terms, conditions and provisions.

The undersigned, as a condition to his admission as a member of the Company, hereby agrees to be bound by the Operating Agreement. The undersigned acknowledges and understands that for purposes of the Operating Agreement, he shall have the same rights and obligations under the Operating Agreement as the Company's other members, proportionate to his membership interest as between the undersigned and the Company's other members, unless otherwise agreed in writing between the Company and/or the undersigned by the Company's members (including the undersigned).

**{¶ 8}** Snyder terminated his employment with Northcoast in July 2018. Shortly after Snyder's resignation, Class C member Chuck Cerankosky, Jr. ("Cerankosky") provided written notice to the company of his retirement and proposed a plan to be compensated for his equity in the company taking into consideration Northcoast's financial situation. On October 2, 2020, through his attorney, Snyder issued a "notice of put option" to managing member Rizzo exercising his option "with respect to Northcoast purchasing and redeeming all of his 60 Class C Membership Units." Journal entry No. 122790324, p. 2 (Apr. 18, 2022). Northcoast did not agree, and Snyder filed the instant action for breach of contract.

{¶ 9} The parties filed cross-motions for summary judgment. The trial court denied Northcoast's motion and granted Snyder's. The trial court held that the language was clear and unambiguous and any ambiguity would be construed strictly against the drafter. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 667 N.E.2d 949 (1996); *Clifton Steel Co. v. Trinity Equip. Co.*, 2018-Ohio-2186, 115 N.E.3d 10 (8th Dist.). Snyder was awarded $294,064.04 plus prejudgment interest ("PJI").

{¶ 10} Northcoast timely appeals.

## II. Assignments of Error

{¶ 11} Northcoast assigns three errors:

I. The clear and unambiguous language of the amended operating agreement did not grant Snyder a "put option" in his Class C units.

II. Snyder was not entitled to have the amended operating agreement strictly construed in his favor.

III. Extrinsic evidence wrongfully ignored by the court below reinforced that the intent of the parties was to not grant a "put" option to holders of Class C units. The trial court erred in granting the appellee's motion for summary judgment because disputed material issues of fact exist regarding the appellee's contractual obligations towards the appellant.

## III. Discussion

{¶ 12} Northcoast's overarching argument is that the trial court's grant of summary judgment was in error because (1) the Operating Agreement does not clearly grant the put option; (2) Snyder was not entitled to strict construction in his favor; (3) extrinsic evidence should not have been ignored to determine intent; and

(4) genuine issues of material fact exist regarding construction of the Operating Agreement. We combine the assigned errors for ease of analysis.

## A. Standard of Review

{¶ 13} "We review a trial court's decision on summary judgment under a de novo standard of review." *Elam v. Woodhawk Club Condominium*, 8th Dist. Cuyahoga No. 107092, 2019-Ohio-457, ¶ 7, citing *Baiko v. Mays*, 140 Ohio App.3d 1, 7, 746 N.E.2d 618 (8th Dist.2000). "We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate." *Bank of Am., N.A. v. Michko*, 8th Dist. Cuyahoga No. 101513, 2015-Ohio-3137, ¶ 11.

> Under Civ.R. 56, summary judgment is appropriate when (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party.

*Id*. at ¶ 12.

{¶ 14} "On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate its entitlement to summary judgment." *Id*. at ¶ 13, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996).

> If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. Summary judgment is appropriate if the nonmoving party fails to meet this burden.

*Williams v. AVI Food Sys.*, 8th Dist. Cuyahoga No. 109222, 2020-Ohio-5001, ¶ 11, citing *Dresher* at 293.

### B.  Analysis

{¶ 15} "Contract formation requires an offer, acceptance, consideration, and mutual assent between two or more parties with the legal capacity to act." *Widok v. Estate of Wolf*, 8th Dist. Cuyahoga No. 108717, 2020-Ohio-5178, ¶ 52, citing *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16.  "*A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract.*" (Emphasis sic.)  *Kertes Ents., LLC v. Sanders*, 2019-Ohio-2237, 137 N.E.3d 733, ¶ 19 (8th Dist.), quoting *Kostelnik* at ¶ 16.

{¶ 16} The Ohio Supreme Court recently explained the application of primary and secondary interpretive rules to contract interpretation.

> Rules of contract interpretation are tools that we use to give meaning to disputed terms or provisions so that the contract as a whole will reflect the parties' intent. *See Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus.  These rules can be broken down into two basic categories: primary interpretive rules and secondary interpretive rules.  In all cases involving contract interpretation, we start with the primary interpretive rule that courts should give effect to the intentions of the parties as expressed in the language of their written agreement.  *See Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37.

*Sutton Bank v. Progressive Polymers, L.L.C.*, 161 Ohio St.3d 387, 2020-Ohio-5101, 163 N.E.3d 546, ¶ 15.

{¶ 17}  The court continued,

> Other primary interpretive rules assist the court in doing this by giving guidance on how to interpret the meaning of certain words.  For

example, one rule is that "[c]ommon words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus. Another more specific, but also at times very helpful, rule is that technical terms are to be given their technical meaning "unless a different intention is clearly expressed." *See Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St. 3d 353, 361, 1997-Ohio-202, 678 N.E.2d 519 (1997).

*Id.*

{¶ 18} Secondary rules of interpretation come into play only if the primary tools fail.

Other rules are secondary, rather than primary, interpretive tools and do not operate unless the primary rules of interpretation fail to resolve the contract's meaning. The rule that a contract provision should be strictly construed against one party and liberally construed in favor of the other — either due to the type of contract or contract provision at issue, inequality in bargaining power, or the fact that one party is the drafter and the other is not — is a secondary rule. *See Malcuit v. Equity Oil & Gas Funds, Inc.*, 81 Ohio App.3d 236, 239-240, 610 N.E.2d 1044 (9th Dist.1992). Accordingly, it does not come into play unless the intent of the parties cannot be deciphered because the contract language is reasonably susceptible of two different interpretations. *See id.*

*Id.*

{¶ 19} An appellate court's primary role in reviewing a breach-of-contract claim is to ascertain and give effect to the intent of the parties. "We presume that the intent of the parties to a contract is within the language used in the written instrument." (Citations omitted.) *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9. "If we are able to determine the intent of the parties

from the plain language of the agreement, then there is no need to interpret the contract." *Id.*

{¶ 20} Northcoast argues there is no clear and specific contract provision that grants put options to Snyder so extrinsic evidence must be considered. "A contract is ambiguous if its terms cannot be clearly determined from a reading of the entire contract or if its terms are susceptible to more than one reasonable interpretation." *Militiev v. McGee*, 8th Dist. Cuyahoga No. 94779, 2010-Ohio-6481, ¶ 30, citing *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 716 N.E.2d 1201 (2d Dist.1998). "If the terms of the contract are determined to be ambiguous, the meaning of the words becomes a question of fact, and a trial court's interpretation will not be overturned on appeal absent a showing of an abuse of discretion." *Id.*, citing *Ohio Historical Soc. v. Gen. Maintenance & Eng. Co.*, 65 Ohio App.3d 139, 147, 583 N.E.2d 340 (10th Dist.1989).

{¶ 21} Snyder maintains that Article 3 and Article 8 clearly provide a put option for Class C units. The trial court relied on portions of those articles in granting judgment.

{¶ 22} The Operating Agreement provides for Class A, Class B, and Class C members. No Class B units were issued at the time of the commencement of the First Amendment. As noted herein, Article 3.1 of the Operating Agreement addresses initial capitalization of the company and anticipates issuance of Class C units to Rizzo and others who indicated an intention to purchase units.

{¶ 23} Article 3.2 is entitled "Class B Purchase and Redemption Options." Articles 3.2.2 through 3.2.5 govern the redemption option and put rights logistics for Class B members. The record does not reflect that there were Class B units issued though the Operating Agreement provided authority to do so. Instructive here:

3.2.2 Redemption Option (Put Right).

Each Class B Member shall have the right ("Class B Put Option"), exercisable upon written notice to the Company ("Put Notice"), to require the Company to redeem of all or any portion of his Class B Units subject to the terms and conditions set forth in this Section 3.2. The Class B Put Option shall survive the termination of a Class B Member's employment with the Company or NCRP, as applicable; provided, however, that if a Class B Member's employment with the Company or NCRP is terminated for Cause (as defined in his employment agreement), he shall have no right to exercise the Class B Put Option.

{¶ 24} Article 3.2.3 adds:

3.2.3 Purchase and Redemption Price. The purchase and redemption price for Class B Units shall be determined as follows:

(a) For Fiscal Year ending December 31, 2009, Seven Thousand Five Hundred Dollars per Class B Unit;

(b) For Fiscal Year ending December 31, 2010, Ten Thousand Dollars ($10,000) per Class B Unit; and

(c) For Fiscal Years ending December 31,2011 and thereafter, a price per Class B Unit equal to forty percent (40%) of the Company's Gross Revenues during the immediately preceding Fiscal Year divided by the total number of Units outstanding as of December 31 of such Fiscal Year.

{¶ 25} Article 8 addresses transfers of membership interests. Article 8.3 is entitled "Disposition of Membership Interests Upon Occurrence of Certain Events." Article 8.3.3 gives the company a call option to purchase Class B and Class C units upon the member's termination of employment or due to another event. A call

option is the right, but not the obligation, of the company to require a Member to sell his or her Class B and Class C units to the company subject to the terms set forth in 8.5 upon certain triggering events. Other members may purchase units in the event the company does not purchase all of the subject member's shares.

{¶ 26} Article 8.5 covers "purchase price; terms of payment of purchase price of membership interest; redemption limitation (annual payment ceiling. Article 8.5.3 is pivotal here.

> 8.5.3 Purchase Price. The purchase price for Class B Units will be as set forth in Section 3.2.3 except that if a Class B Member's employment with NCRP is terminated for Cause, the purchase price will be reduced by thirty-three percent (33%). *With respect to Class C Units, if the Call Option or Put Option is exercised prior to May 1, 2014, the purchase price per Class C Unit shall be an amount equal to the Book Value of such Member's Interest. Thereafter, the purchase price per Class C Unit shall be determined in the manner set forth in Paragraph 3.2.3(c).* With respect to Class A Units that are the subject of the exercise of a Call Option upon the occurrence of an Involuntary Event the purchase price for such Units and the terms of payment will be as the Board of Managers of the Company and the holder of such Class A Units may agree and, if they cannot agree within thirty (30) days following the occurrence of such Involuntary Event, the purchase price will be based on Book Value and payable in the manner set forth in Section 8.5.1.

(Emphasis added.) Journal entry No. 122790324, p. 3 (Apr. 18, 2022), quoting Operating Agreement. The language was not modified in the First Amendment.

{¶ 27} Company co-founder Rizzo's affidavit submitted in support of summary judgment provides in pertinent part: "It is clear to me as a holder of Class C units that I do not have the right to a put option under the" Operating Agreement. "Rather, holders of Class C units are subject to a call option but not

entitled to a put option." "The Class C units were intended to represent permanent capital of Northcoast. Granting members of Class C units a put option could cause financial instability with potentially catastrophic results." Rizzo also averred that Snyder never discussed the right of put options for his Class C units but that Class C member Cerankosky approached the members "amicably and engaged in a mutual negotiation over the price and terms of his sale."

{¶ 28} The affidavits of five then-current Class C unit holders contain averments that mirror those of Rizzo. The affidavit of Cerankosky primarily contains averments identical to the others except the last paragraph states that he "wished to sell my Class C units, however, I did not claim that I had a legal right to do so. Rather I approached the members amicably and engaged in a mutual negotiation over the price and terms of my sale."

{¶ 29} Snyder's affidavit in support of summary judgment declares reliance on the call and put options that allowed "Northcoast or myself to opt for a sale of the Units back to Northcoast if we parted ways, thereby allowing the member to at least obtain some of his equity back. I relied on this in making my decision to become a member." Thus, the options served as "an enticement for Snyder's decision to invest $150,000 and become a member in Northcoast." Motion for Summary Judgment, p. 11.

{¶ 30} Northcoast is correct that an unsupported, self-serving affidavit, "'standing alone and without corroborating materials under Civ.R. 56, will not be sufficient to demonstrate material issues of fact.'" *Davis v. Cleveland*, 8th Dist.

Cuyahoga No. 83665, 2004-Ohio-6621, ¶ 23, quoting *Bell v. Beightler*, 10th Dist. Franklin No. 02AP-569, 2003-Ohio-88, ¶ 33. However, the same may be said for the affidavits submitted by Northcoast affiants. Both parties have an economic interest in their positions. Both parties rely on the Operating Agreement in support.

{¶ 31} Snyder adds that, despite Cerankosky's affidavit, when placed in context, the Cerankosky letter referenced by Northcoast and Rizzo supports Snyder's understanding of the Operating Agreement. Cerankosky advised Northcoast of his retirement decision and stated in part:

> Regarding the value of my equity in the firm, and realizing the firm's financial situation, I propose valuing it at $100,000. Further, after my employment ends (about December 31, 2018) such equity value would be conveyed to me through ongoing payments of my family-plan health insurance plan and cell phone reimbursement, plus $1,000 per month. I'm guessing those items would total about $2,500 per month.
>
> My loan to the firm would be on the same terms as the other partner lenders. I would still receive financial statements until the monthly payments total $100,000 or the loan is repaid in full, whichever occurs last.
>
> Should Northcoast Research be sold within 18 months of my last day of employment at a value that exceeds $800,000, net, to the original 8 employee partners I would receive my pro rata share in excess of $100,000.

{¶ 32} Snyder offers that Cerankosky "did not propose selling his interest, he proposed only a concession on the price from section 3.2.3(C) and more palatable payment terms since he 'realized'" the company's financial situation. Motion for Summary Judgment, p. 13. The letter expresses an understanding that Northcoast was obligated to purchase the interest.

{¶ 33} It is also observed that the heading of Article 8 references Class B units. However, this court has explained, "a heading is merely directional and for the ease of the reader." *Washington v. GEICO Ins. Co.*, 8th Dist. Cuyahoga No. 100527, 2014-Ohio-4375, ¶ 14; citing *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 212, 519 N.E.2d 1380 (1988); *Inchaurregui v. Ford Motor Co.*, 9th Dist. Lorain No. 98CA007187, 2000 Ohio App. LEXIS 2380, 8 (June 7, 2000)*; Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. "[T]he nature of a given provision is determined not by the label the parties give it, but rather by the legal effect of the provision as expressed by the parties in their agreement." *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 241, 513 N.E.2d 253 (1987).

{¶ 34} The trial court reasoned:

> Pursuant to Article 3 — Capitalization, subsection 3.2.2, holders of Class B Units have the Class B Put Option right to exercise upon written Put Notice to the Company to require the Company to redeem all or any portion of the holder's Class B Units subject to the terms and conditions of the Operating Agreements. While holders of Class B Units are again addressed relating to Put Options rights in subsection 8.5.3, this secondary reference regarding Put Options does not dilute the Put Option rights of holders of Class C Units referenced in subsection 8.5.3.
>
> * * *
>
> Neither the language nor the terms composing the contract contradict or redact the holders of Class C Units' Put Option expressly stated in subsection 8.5.3. The Operating Agreements expressly state in two different subsections, to wit, 3.2.2, infra, and 8.5.3, infra, that holders of Class B Units have a right of Put Option where the Operating Agreements express the right of Put Option for Class C Unit holders only once in subsection 8.5.3. Nevertheless this singular expressed right of Put Option for Class C unit holders does not diminish the clear

and unambiguous language of 3.2.2 granting said Put Option right to holders of Class C Unit [owners] expressly.

Journal entry No. 122790324, p. 3[2] (Apr. 18, 2022).

{¶ 35} We reiterate that it is this court's role to give effect to the intent of the parties and "[w]e presume that the intent of the parties to a contract is within the language used in the written instrument." (Citations omitted.) *Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9. "If we are able to determine the intent of the parties from the plain language of the agreement, then there is no need to interpret the contract." *Id.*

{¶ 36} Based on our de novo review of the record, and viewed in a light most favorable to the nonmoving party, we agree with the trial court's conclusion that the plain language of the Operating Agreement unequivocally provides call and put options to Class C Units:

> With respect to Class C Units, if the Call Option or Put Option is exercised prior to May 1, 2014, the purchase price per Class C Unit shall be an amount equal to the Book Value of such Member's Interest. Thereafter, the purchase price per Class C Unit shall be determined in the manner set forth in Paragraph 3.2.3(c).

{¶ 37} Also, as the trial court recognized, in the event the language was deemed ambiguous, though that is not this court's finding, the rule that a contract provision should be strictly construed against one party and liberally construed in favor of the other, the outcome would be the same. *Progressive Polymers, L.L.C.*, 161 Ohio St.3d 387, 2020-Ohio-5101, 163 N.E.3d 546, ¶ 15.

---

[2] The reference to "Class C" in the last line is an apparent typographical error and should say "Class B" pursuant to the trial court's full opinion.

{¶ 38} The assigned errors lack merit.

## IV. Conclusion

{¶ 39} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

ANITA LASTER MAYS, ADMINISTRATIVE JUDGE

MICHAEL JOHN RYAN, J., CONCURS;
MICHELLE J. SHEEHAN, J., DISSENTS (WITH SEPARATE OPINION)


MICHELLE J. SHEEHAN, J., DISSENTING:

{¶ 40} I respectfully dissent from the majority opinion in this case and would reverse the judgment of the trial court. The majority opinion finds that the plain language of Article 8.5.3 of the Operating Agreement "unequivocally provides call and put options to Class C Units." I disagree. "A court has an obligation to give plain language its ordinary meaning and to refrain from rewriting the contractual agreement of the parties." *Miller v. Marrocco*, 28 Ohio St.3d 438, 439, 504 N.E.2d 67 (1986). Further, when reviewing contract language, we have found that courts

"may not read language or terms into a contract." *Gray-Jones v. Jones*, 137 Ohio App.3d 93, 105, 738 N.E.2d 64 (10th Dist.2000), citing *Miller*, *supra*.

{¶ 41} Within the Operating Agreement, the sole reference to Class C Unit put options is contained in Article 8.5.3, which reads:

> With respect to Class C Units, if the Call Option or Put Option is exercised prior to May 1, 2014, the purchase price per Class C Unit shall be an amount equal to the Book Value of such Member's Interest.

{¶ 42} Article 8.5.3 details the method to determine the purchase price of Class C options that are exercised. It does no more. As to put options, the Operating Agreement expressly creates Class B Unit put options in Article 3.2.2; however, it contains no provision creating Class C Unit put options. To interpret Article 3.2.2 as creating Class C Unit put options would require additional terms to be read into the contract that do not exist. *Gray Jones*, *supra*. Accordingly, I would refrain from finding that Article 3.2.2 provides call and put options to Class C Units.