The **EXTRACORPOREAL ALLIANCE, L.L.C. Plaintiff**

v.

Michael **ROSTECK, et al. Defendants**

No. 4:03 CV 1729.

United States District Court, N.D. Ohio, Eastern Division.

Sept. 5, 2003.

Barry W. Fissel, Esq., Margaret Matimoe Sturgeon, Esq., Eastman & Smith, Toledo, OH, Sharon M. Woods, Esq., Barris, Sott, Denn & Driker, Detroit, MI, for Plaintiff/Counter–Defendant Extracorporeal Alliance, L.L.C.

John T. Heino, Esq., Richard J. Thomas, Esq., Henderson Covington Messenger Newman, Youngstown, OH, for Defendants/Counter–Claimants Michael Rosteck and Perfusion, L.L.C. Advanced.

*MEMORANDUM OF OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION*

WELLS, District J.

This case is now before the Court on a motion for a preliminary injunction filed by plaintiff, The Extracorporeal Alliance, L.L.C. ("Alliance"). (Docket # 3). This Court conducted an evidentiary hearing on plaintiff's motion on 28 August 2003, with counsel and parties present. On 2 September 2003, defendants, Michael Rosteck ("Rosteck") and Advanced Perfusion, L.L.C. ("Advanced Perfusion"), filed a brief in opposition to plaintiff's motion.

(Docket # 19). Moreover, on 2 September 2003, both parties submitted briefs on the choice of law to be applied to several employment and confidentiality agreements at issue in this case. (Docket # 14 and # 19). Plaintiff filed a reply brief on 3 September 2003.

For the reasons that follow, plaintiff's motion is denied.

## I. BACKGROUND FACTS

On 13 June 1992, defendant Michael Rosteck was hired to work as a perfusion[1] technologist by Bay Extracorporeal Alliance ("Betech"). (Pl.Ex. E). Betech was a Florida corporation in the business of providing cardiovascular perfusion services and having its principal place of business in Panama City, Florida. (Pl.Ex. E). While living as a resident of Michigan, Mr. Rosteck negotiated by phone the terms of his employment with representatives of Betech in Florida. (Tr. at 97–98). As a result of these negotiations, Betech and Mr. Rosteck agreed that he would begin employment for Betech in Panama City, Florida on 15 June 1992. (Pl.Ex. E, Tr. at 96–97). When Mr. Rosteck arrived in Florida on 13 June 1992, he met with a representative of Betech and signed a one-year employment agreement under which he would be paid $47,500 to work as a perfusion technologist. (Pl.Ex. E, Tr. at 96–97). While the employment agreement between Mr. Rosteck and Betech was a one-year contract, it was, by its terms, "considered renewed for regular periods of one year, provided neither party submits a notice of termination." (Pl.Ex. E). In addition, this agreement included the following relevant clauses:

1. Perfusion involves the use of heart and lung bypass machines designed to keep patients alive, and their blood circulating and oxygenating, during open heart surgery. Perfusion services are, therefore, specialized healthcare support services used by surgeons and hospitals in connection with cardiac surgery. (Pl. Ex. B)

7. **Employee to Devote Full Time to Company's Business**. Employee will devote his entire time, attention, and energies to the business of the Company [Betech], and, during employment hours, will not engage in any other business activity, regardless of whether such activity is pursued for profit, gain, or other pecuniary advantage. However, Employee is not prohibited from making personal investments in any other businesses, as long as those investments do not require Employee to participate in the operation of the companies in which he invests while under the Company's direction.

10. **Confidentiality**. Employee will not at any time, in any fashion, form, or manner either directly or indirectly divulge, disclose, or communicate to any person, firm or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of the Company, including, without limitation, the names of any of its customers, the prices it obtains or has obtained, or at which it sells or has sold its products, services, or any other information concerning the business of the Company, its manner of operation, or its plans, processes, or other data of any kind, nature, or description without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important.

13. **Non–Competition Clause**. Employee agrees that during the terms of his employment and for a period of twelve (12) months following the termination of employment for any cause he will not directly or indirectly:

a. Sell or attempt to sell any product or service to any medical facility, business or person that the Company is doing business with as of the effective date of the Employee's termination, if that product or service competes directly with any product or service which is offered by the Company.

b. Hire or attempt to induce any employee of the Company to terminate his/her employment with the Company. The Company has invested time, personnel and resources to recruiting and training personnel; setup and maintenance of accounts, and to establish a reputation in the industry. Employee understands and acknowledges that the non-compete clause is reasonably necessary for the protection of the Company's business, not unreasonably restrictive upon the Employee's rights, and not against public policy.

(Pl.Ex. E)

On 1 August 1994, Betech entered into a five-year exclusive agreement, effective 1 November 1994, to provide perfusion services at St. Elizabeth Hospital Medical Center ("St.Elizabeth") in Youngstown, Ohio. (Compl.¶ 5, Pl.Ex. O). Subsequently, Mr. Rosteck was transferred from Florida to work for Betech at St. Elizabeth in Youngstown. (Tr. at 99)

In January 1997, Betech sold its assets to Alliance in exchange for a nine percent membership interest in the Alliance. (Compl.¶ 5, Pl.Ex. O). Alliance, as successor to Betech, continued providing perfusion services at St. Elizabeth pursuant to the terms of the 1994 Betech Agreement. (Compl.¶ 5). At the expiration of the 1994 agreement, Alliance entered into a three-year Perfusion Services Agreement, effective 1 September 1999, to continue providing perfusion services at St. Elizabeth. (Pl.Ex. D). After Betech's asset sale to Alliance in January 1997, Mr. Rosteck continued working at St. Elizabeth as a perfusionist for Alliance, eventually becoming clinical manager of perfusionist services at St. Elizabeth. (Pl.Ex. Q, Tr. at 99–100, Compl. ¶ 6).

On August 8, 1997, Mr. Rosteck signed a Confidentiality Agreement with the Alliance agreeing, in part, to the following:

1. ***Prohibition on Disclosure.*** The Individual hereby covenants and agrees that he/she shall not make any use for his/her own benefit, or for the benefit of any person, firm, partnership, joint venture, corporation, or other entity, other than the Alliance, any Confidential Information (as hereinafter defined) or other data or proprietary information of, or pertaining to, the Alliance, any of its Affiliates (as hereinafter defined), or the business and financial affairs and services of the Alliance and its Affiliates, whether in existence at the time of this Agreement or developed in the future, without the express written consent of Alliance.

2. ***Confidential Information.*** The term "Confidential Information" shall mean all business records, materials, information, policies, procedures and techniques, including, but not limited to the Continuous Quality Improvement Manual; business plans; financial records and information; data and materials; marketing plans, and information; selling procedures and techniques; business projections and plans; contracts and agreements; or patient records, whether oral, written, or in any other format, regarding the Alliance or its Affiliates. (Pl.Ex. F). The 1997 Confidentiality Agreement specifies that the terms of the agreement shall be effective from the date of its execution until four years after the termination of Mr. Rosteck's employment.

(Pl.Ex. F). Subsequently, on three different occasions during his employment with Alliance, Mr. Rosteck signed documents, dated 15 January 2001, 1 February 2002, 3 December 2002, stating that he had received Fresenius' Code of Business Conduct[2] and would comply with it. (Pl. Exs. G, H, and I). The relevant Codes of Business Conduct (2000 and 2002) included the following provisions concerning proprietary information and conflicts of interest:

**Proprietary Business Information: Do not give confidential or proprietary Information about Fresenius to unauthorized persons such as competitors, suppliers, or outside contractors.** Financial information, customer lists, pricing information, Company manuals and policies, and descriptions of Company processes or operations should not be discussed with unauthorized persons. The rules of confidentiality continue to apply after you have left Fresenius. (p. 19)

**Employment outside Fresenius with a company doing business with, or directly competing against, Fresenius must be approved by your manager.** (Pl. Exs. J and K).

On 7 March 2001, Mr. Rosteck also signed an additional document agreeing to abide by Fresenius' policy concerning the non-disclosure of confidential information which includes "all information relating to the business of FMC that has not been released publicly by authorized representatives of FMC." (Pl.Ex. L). In this document, Mr. Rosteck also certified that the

---

**2.** On 1 January 2001, majority member of the Alliance, Everest Healthcare Services Corporation ("Everest"), bought out the membership interests of all minority members of Alliance, including Betech. (Pl.Ex. O, Compl. ¶ 5). On 8 January 2001, all of the stock of Everest was sold to Fresenius Medical Care AG. Ultimately, on 22 August 2001, after Everest merged with Edmund Acquisitions Sub,

Inc. and was renamed Everest Healthcare Holdings, Inc. ("Everest Healthcare"), Fresenius Medical Care AG transferred all of the stock of Everest Healthcare to its wholly-owned subsidiary, Fresenius Medical Care Holdings, Inc. (Pl.Ex. O, Compl. ¶ 5). As a result, the documents signed by Mr. Rosteck after January 2001 refer to Fresenius Medical Care and its policies and procedures.

he would "be loyal to FMC during the term of my employment" and would not "associate with or have a significant interest in any other party whose interests might conflict with those of FMC." (Pl.Ex. L).

During Mr. Rosteck's employment with Alliance, he was exposed to forms, policies, procedures, and programs developed and utilized by Allliance. (Pl.Ex. B, Tr. at). In the course of his job, Mr. Rosteck used Alliance's quality tracking program and its physician preference forms and adhered to its policy and procedural manuals. (Pl.Ex. B, Tr. at 38). Moreover, as clinical manager for perfusion services at St. Elizabeth, Mr. Rosteck had access to financial information related to its perfusion services at St. Elizabeth. (Pl.Ex. B, Tr. at 32–33).

On 31 August 2002, Alliance's three-year agreement to provide perfusion services expired. (Pl.Ex. B, Defs.Ex. 1). In September of 2002, Alliance submitted a new proposal to St. Elizabeth whereby Alliance would continue to serve as the exclusive provider of perfusion services. (Tr. at 42–43). Representatives of Alliance, including Thomas Coley, Divisional Vice–President for Alliance, and Mr. Rosteck, held one meeting with Lisa Parrish, Vice President Heart and Vascular Services at St. Elizabeth, to discuss the new proposal. (Tr. at 43). Though Alliance submitted only one proposal and held only one meeting with St. Elizabeth, it attempted to schedule additional meetings, but St. Elizabeth declined. (Tr. at 42–44). By participating in these negotiations, Mr. Rosteck had access to some of Alliance's proposed pricing information for perfusion services under their new written proposal. (Tr. at 22–23).

St. Elizabeth never agreed to the new proposal. (Ex. B, Ex. U).

Meanwhile, on 27 March 2003, Michael Rosteck, Diane Rosteck, and Ronald Snyder formed Advanced Perfusion, L.L.C. ("Advanced Perfusion"). (Pl.Ex. AA).[3] Shortly thereafter, representatives of Advanced Perfusion, including Mr. Rosteck, began negotiations with St. Elizabeth to obtain an exclusive perfusion services contract. (Pl. Exs. B, U, and EE). On 20 May 2003, representatives of Advanced Perfusion and St. Elizabeth signed a three-year contract, effective 1 September 2003, whereby Advanced Perfusion would serve as the sole provider of perfusion services at St. Elizabeth. (Pl.Ex. BB). These contract negotiations were conducted without the knowledge of Alliance, and Alliance did not become aware of Advanced Perfusion's contract with St. Elizabeth until 9 July 2003. (Tr. at 70–71, Exs. B and U). On 28 July 2003, Mr. Coley, James Brown, Regional Vice President of Alliance, and Steven Van Arsdale, Director of Human Resources for Alliance met with Michael Rosteck to discuss this matter and terminated him that day. (Exs. B and U).

On 14 August 2003, Alliance initiated this current action seeking damages and injunctive relief against Michael Rosteck and Advanced Perfusion for breach of non-compete agreements, breach of confidentiality agreements, misappropriation of trade secrets, tortious interference with contract and business relationships, and breach of duty of loyalty and fiduciary duty. (Compl.¶ 33–64). Alliance also filed on that same day a motion for a preliminary injunction which is currently under consideration by this Court. While Advanced Perfusion is scheduled to begin

3. On 27 March 2003, Michael Rosteck, Diane Rosteck, and Ron Snyder were all employees of Alliance working as perfusionists at St. Elizabeth. (Tr. at 70). All three continued working for Alliance at St. Elizabeth at least through July 28, 2003. (Exs. B and U, Tr. at 21).

providing perfusion services at St. Elizabeth beginning 8 September 2003, Alliance continues to provide perfusion services at St. Elizabeth and will do so until that date. (Tr. at 17–19, 84–85).

## II. CHOICE OF LAW ANALYSIS

Because this Court's jurisdiction is based solely on diversity, pursuant to 28 U.S.C. § 1332, it is necessary to decide which state's law should be applied in considering the substantive claims. While the plaintiff's complaint alleges claims arising in both contract and tort, the choice of law issues solely relate to the interpretation and enforceability of several agreements and acknowledgments/certifications, including: 1) 1992 Employment Agreement between Michael Rosteck and Betech; 2) 1997 Confidentiality Agreement between Michael Rosteck and Alliance; 3) three separate certifications of training completion signed by Michael Rosteck on 15 January 2001, 1 February 2002, and 3 December 2002; and 4) 2001 Non-disclosure Agreement between Michael Rosteck and Fresenius. Plaintiff and defendants agree that Ohio law applies to the confidentiality agreements and the certifications. The only choice of law issue in dispute involves the 1992 employment agreement between Mr. Rosteck and Betech. Plaintiff contends that Ohio law applies to the employment agreement while defendants argue that Florida Law should apply. Thus, this Court must determine whether Ohio or Florida governs the parties' rights and responsibilities under the 1992 Employment Agreement.

■ In a diversity action, a federal court applies the choice of law rules of the state in which the court sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir.1999); *National Union Fire Insurance Co. v. Watts*, 963 F.2d 148, 150

(6th Cir.1992). Therefore, Ohio's choice of law rules govern in this case.

■ Under Ohio law, subject to limited exceptions, courts should apply the law of the state chosen by the parties to a contract to govern their contractual rights and duties. *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 6 Ohio St.3d 436, 438, 453 N.E.2d 683 (*citing* Restatement of Law 2d, Conflict of Laws § 187); *Ohayon v. Safeco Ins. Co. of Illinois*, 91 Ohio St.3d 474, 477, 747 N.E.2d 206 (2001). Absent such a choice by the parties, Ohio's choice of law rules require a court to apply the law of the state with the most significant relationship to the contract. *Ohayon*, 91 Ohio St.3d at 477–78, 747 N.E.2d 206; *International Insurance Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir.1996). To determine which state has the most significant relationship to the contract, Ohio has adopted the test set forth in the Restatement (Second) of Conflict of Laws § 188 (1971). *Gries Sports Ent., Inc. v. Modell*, 15 Ohio St.3d 284, 284, 473 N.E.2d 807 (1984); *Ohayon*, 91 Ohio St.3d at 478, 747 N.E.2d 206; *International Insurance Co.*, 86 F.3d at 604. Section 188 provides, in relevant part,

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties ... the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Underlying these Section 188 factors are the principles enunciated in Section 6 of the Restatement, which provides,

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Thus, the Section 188 factors embody the general principles of § 6 as applied to contracts.

The Sixth Circuit has explained that, "when sections 6 and 188 are read together, it is clear they only provide a broad framework for the resolution of choice of law issues in the context of a contractual dispute." *International Insurance,* 86 F.3d at 606. The § 6 principles "need not be given equal weight in every circumstance, nor are they intended to be exclusive. They also are relatively elastic, and in some cases equivocal." *Id.*

Applying these choice of law principles to the present case, this Court concludes that Florida law applies to the 1992 Employment Agreement. While a few of the factors enumerated in Section 188 are equivocal with respect to the choice of law question, the balance is in favor of Florida law. Factors (a), (b), and (c) of Section 188 all support the application of Florida law while factor (d) is inapplicable and factor (e) is somewhat inconclusive. Factor (a), the place of contracting, obviously weighs in favor of Florida law since the employment contract was finally executed in Florida where Michael Rosteck signed the contract on 13 June 1994. The place of contracting may be a relatively insignificant contact when "it is purely fortuitous and bears no relation to the parties and the contract." *See* Restatement (Second) of Conflict of Laws § 188, cmt. e. Here, however, the place of contracting bore a direct relationship to the parties and the contract. Michael Rosteck moved to Florida to begin employment in Florida with a Florida corporation.

The impact of factor (b), the place of negotiation, is more equivocal. While he was a resident of Michigan, Mr. Rosteck negotiated this contract by telephone with representatives of the corporation in Florida. Therefore, this factor favors equally the application of Michigan and Florida law, but provides no support for applying Ohio law.

■ Both parties place considerable emphasis on factor (c), the place of performance of the contract. Plaintiff admits that Mr. Rosteck originally performed the contract in Florida. However, it argues that this factor favors the application of Ohio law because the contract has been performed for the last nine years in Ohio, was renewed over eight times in Ohio, and the alleged breach of the contract took place in Ohio. Defendant contends that this factor

weighs in favor of Florida law because the contract was negotiated in contemplation of employment in Florida and because Mr. Rosteck performed under the contract in Florida for approximately three years. The parties' emphasis on the place of performance is consistent with the importance placed on this factor under Ohio law:

> Generally, Ohio follows the rule that where a conflict of law issue arises in a case involving a contract, the law of the state where the contract is to be performed governs .... Some courts have noted that the rationale for this rule is that the place of performance bears the most significant relationship to the contract.

*Schulke Radio Productions,* 6 Ohio St.3d at 438, 453 N.E.2d 683; *see also Gries Sports Ent.,* 15 Ohio St.3d at 286, 473 N.E.2d 807.

This Court concludes that the place of performance of the contract favors the application of Florida law. The Restatement explains that place of performance bears little weight in the choice of applicable law when "the place of performance at the time of contracting is either uncertain or unknown." *See* Restatement (Second) of Conflict of Laws § 188, cmt. e. However, this comment does not mean that the place of performance must be specified in the contract but rather that a particular place of performance must be contemplated by the parties *at the time of contracting.* In this case, Mr. Rosteck and Betech clearly contemplated performance in Florida as Mr. Rosteck moved to Florida to sign the employment contract and begin employment under the agreement. The fact that Mr. Rosteck ultimately worked in Ohio under this employment agreement gives little weight under factor (c), if any, to the application of Ohio law because that place of employment was not contemplated at the time of contracting.

Plaintiff relies on *National Union Fire Ins. Co. v. Watts,* 963 F.2d 148 (6th Cir. 1992) to argue that factor (c) supports the application of Ohio law. In *National Union Fire,* the Sixth Circuit interpreted the omission of a choice of law provision to mean that the insurer intended its coverage to be governed by the state in which the claimant was using the vehicle at the time of a claim. Plaintiff argues, by analogy, that silence as to choice of law in this case should be interpreted to intend the law of the state where the employee was stationed at the time of the alleged misconduct. However, such a construction of *National Fire Union* is misplaced. The contract at issue in *National Fire Union* was a nationwide insurance policy providing coverage to a trucking company's employees and agents. Faced with the choice between the place of business of the truck driver (Texas) and the corporation (Indiana), the trial court found the situs of the accident to have the most significant relationship to the insurance contract. *National Fire Union* involved a contract where the place of performance was likely to change on almost daily basis and there were no specific expectations as to a particular state of performance at the time of contracting.

In contrast, Mr. Rosteck and Betech, in this case, negotiated the employment agreement in anticipation of the start of his employment in a particular state, Florida. While a change in employment location was certainly possible, no specific changes were contemplated at the time of the contract. The approach taken by the Sixth Circuit in *National Fire Union* is unnecessary given the very different facts of this case. Moreover, a choice of law rule, like the one suggested by Plaintiff, where the law governing an employment contract would automatically change whenever an employee was transferred runs contrary to a number of general choice of

law principles articulated by Restatement (Second) of Conflict of Laws § 6. In particular, such a rule would, in many cases, conflict with the justified expectations of the parties and forum states and would undermine certainty, predictability and uniformity of results. Restatement (Second) of Conflict of Laws § 6, (2)(d) and (f).

Factor (d) is inapplicable to the facts of this case. This factor applies where the contract deals with a "specific physical thing" or "affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment." Restatement (Second) of Conflict of Laws § 188, cmt. e. The employment contract in this case does not involve either a specific thing or protection against a localized risk.

Factor (e), which includes the domicile, residence, place of incorporation, and place of business of the parties, is inconclusive on the facts of this case. One of the parties to the agreement, Mr. Rosteck, originally resided in Michigan, then became a resident of Florida to begin his employment under the agreement, and finally was transferred to Ohio where he currently resides. Betech, the other original party to the agreement, was a Florida corporation which sold its assets to Alliance, its successor in interest. Alliance is a Delaware business with a principal place of business in Massachusetts. Since the significance of this factor tends to assume greater importance when combined with other contacts, it offers some support for the application of Florida law. Restatement (Second) of Conflict of Laws § 188, cmt. e. However, given these facts, factor (e) appears, on the whole, somewhat inconclusive.

To the extent that Restatement Section 6 principles are not fully embodied by the Section 188 factors and should be analyzed separately, they too indicate that Florida law should apply. As noted in *International Insurance*, the most signifi-

cant Section 6 principle is the protection of justified expectations of the contracting parties. 86 F.3d at 606. It is clear from the discussion above that the original parties to the employment agreement would reasonably have expected Florida law to govern their rights and responsibilities under the contract. As noted above, the application of Ohio law actually contradicts certain choice of law principles articulated in Section 6.

In sum, a detailed examination of the factors used by Ohio courts to resolve choice of law questions supports the application of Florida law to Mr. Rosteck's 1992 employment agreement. Therefore, in analyzing the merits of plaintiff's motion for a preliminary injunction, this court will apply Florida law to the 1992 employment agreement and any claims arising from it and will apply Ohio law to all of Alliance's other claims.

## III. ANALYSIS AND CONCLUSIONS OF LAW

The plaintiff has moved for a preliminary injunction against defendants' Michael Rosteck and Advanced Perfusion seeking to prevent them from:

a. soliciting employees to leave Alliance and work for Mr. Rosteck or Advanced Perfusion;

b. hiring any employees of the Alliance;

c. inducing employees of the Alliance to breach their employment, confidentiality, noncompete, loyalty, or other agreements with Alliance;

d. performing any perfusion services or work at St. Elizabeth;

e. tortiously interfering with Alliance's actual or potential contract of business relationship with St. Elizabeth; and/or,

f. misappropriating the Alliance's trade secrets or using Alliance's confidential information without authorization.

This Court must now evaluate whether any preliminary relief is appropriate, and, if so, exactly what type of relief is warranted.

## A. Standard for a Preliminary Injunction

██ Before issuing a preliminary injunction, a court must consider the following four factors:

1. Whether a movant has shown a strong or substantial likelihood or probability of success on the merits.

2. Whether the movant has shown irreparable injury.

3. Whether the preliminary injunction could harm others.

4. Whether the public interest would be served by issuing the preliminary injunction.

*Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977); *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985). These considerations are "factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985). While the court must engage in this balancing test, "a plaintiff must always demonstrate some irreparable injury before a preliminary injunction may issue." *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 104 (6th Cir.1982). With these standards in mind, this Court must determine whether plaintiff has demonstrated a need for a preliminary injunction with respect to any of its claims.

## B. Strong or Substantial Likelihood or Probability of Success on the Merits

In analyzing this factor, the Court considers each of plaintiff's claims in turn and concludes that the breach of loyalty claim is the only one where the plaintiff has demonstrated a strong or substantial likelihood or probability of success on the merits.

### 1. Count I: Breach of Covenant Not to Compete (Defendant Rosteck)

In its first claim, Alliance alleges that Mr. Rosteck breached two separate non-competition clauses found in: 1) His 1992 employment agreement; and 2) Fresenius' Business Code of Conduct.

#### 1. The 1992 Agreement

██ As discussed above in Part II, Florida law applies to this agreement. Both parties agree that Alliance became the successor to Betech through an asset sale. Under Florida law, "when the sale of the assets includes a personal service contract that contains a noncompete agreement, the purchaser can enforce its terms only with the employee's consent to an assignment." *Corp. Express Office Products, Inc. v. Phillips,* 847 So.2d 406, 413 (Fla.2003). Mr. Rosteck did not expressly consent to the assignment of his employment agreement. (Tr. at 101).

Alliance argues that because Mr. Rosteck was aware that his employment agreement had been assigned to Alliance and yet continued to work for Alliance, Mr. Rosteck's acquiesce constituted consent. Alliance relies on *Schweiger v. Hoch.* 223 So.2d 557, 558 (Fla.App.1969), for its position. Alliance, however, misinterpreted the holding in *Schweiger.* In *Schweiger,* the Florida Court of Appeals reversed the entry of an injunction and award of damages by the trial court against a former employee of the employer for breach of the non-competition agreement. The Florida court stated:

> The contract not to compete was for the benefit of the employing firm and when the firm changed it was incumbent upon the new firm to then have a new contract not to compete entered into. . . . It

would not be the duty of the employee, when the firm was changed, to approach the employer and repudiate the contract which he had with the original employer. *Id.* at 559. Under *Schweiger*, Mr. Rosteck does not have the duty to approach Alliance and repudiate the contract he had with Betech. It is Alliance's duty to enter into a new non-competition agreement with Mr. Rosteck. Alliance did not do so.

Under Florida law, the 1992 non-competition agreement was not assigned from Betech to Alliance, and therefore the agreement is not enforceable by Alliance against Mr. Rosteck.

### 2. The Code of Business Conduct

■ Mr. Rosteck's certification that he would perform his job in compliance with Fresenius' Code of Business Conduct is governed by Ohio law. While he signed such certifications on three different occasions, on 15 January 2001, 1 February 2002, and 3 December 2002, the contents of each were substantially similar and none of these unilateral certifications constituted contracts. In fact, the agreements themselves are very clear on this point; each expressly stating that it did not create an employment contract or term of employment. In order to form a valid contract, both parties must intend it to be a contract. *DeKoning v. Flower Mem. Hosp.*, 82 Ohio Misc.2d 20, 676 N.E.2d 614, 619 (1996). No such intention has been shown. Therefore, Mr. Rosteck's certification of compliance with the Code of Business Conduct is not an enforceable non-competition agreement. Any failure to adhere to it may be a break with company protocol but it is not an actionable breach of contract.

For these reasons, with respect to its first claim, Alliance has not shown a strong or substantial likelihood or probability of success on the merits.

### 2. Count II: Breach of Written Confidentiality Agreement (Defendant Rosteck)

■ In this claim, Alliance alleges that various confidentiality agreements signed by Mr. Rosteck constituted contracts and that Mr. Rosteck breached these agreements when he, on behalf of Advanced Perfusion, negotiated and obtained a perfusion services contract with St. Elizabeth. The confidentiality agreements include: 1) 1997 Confidentiality Agreement between Michael Rosteck and Alliance; 2) three separate certifications of training completion signed by Michael Rosteck on 15 January 2001, 1 February 2002, and 3 December 2002; and 3) 2001 Non-disclosure agreement between Michael Rosteck and Fresenius.

On the facts currently before the court, Alliance is unlikely to prevail on this claim. As discussed above, the three certifications signed by Mr. Rosteck whereby he agreed to adhere to Fresenius' Code of Business Conduct did not constitute contracts. Therefore, these certifications cannot support Alliance's breach of contract claim. Assuming the enforceability of the 1997 and 2001 agreements, Alliance has failed to present evidence that these agreements were, in fact, breached. Alliance suggests that Mr. Rosteck must have used confidential information in order to negotiate the perfusion services contract between Advanced Perfusion and St. Elizabeth. However, Alliance's suggestion of inevitable use of confidential information constitutes the full extent of its evidence on this claim and that is not enough to demonstrate a substantial likelihood of prevailing on this claim.

### 3. Count III: Misappropriation of Trade Secrets (Defendants Rosteck and Advanced Perfusion)

■ Ohio protects trade secrets under its Uniform Trade Secrets Act, O.R.C.

1333.61, *et seq.* A trade secret is defined by section 1333.61(D) of the Ohio Revised Code as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> > (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> >
> > (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The Ohio Supreme Court has also adopted the following factors in analyzing a trade secret claim:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 399–400, 732 N.E.2d 373 (2000).

Ohio law provides that actual or threatened misappropriation trade secrets may be enjoined. O.R.C. 1333.62(A). Misappropriation of trade secrets includes both the acquisition of a trade secret of another by one "who knows or has reason to know that the trade secret was acquired by improper means" and the disclosure or use of a trade secret of another without that person's consent if it was acquired by improper means or "derived from or through a person who owed a duty ... to maintain its secrecy or limit its use." O.R.C. 1333.61(B)(1) and (2). Therefore an injunction may be appropriate only if Alliance can demonstrate both the existence of a protectable trade secret and its actual or threatened misappropriation.

Alliance claims that defendants have misappropriated its trade secrets by using them to obtain the perfusion contract with St. Elizabeth and/or by their inevitable use of these secrets in performing the contract. Alliance alleges that defendants actually misappropriated or threatened misappropriation of a quality tracking program, information included in its physician preference forms, and confidential financial information. Even assuming such information constitutes protectable trade secrets, which is not at all clear on this record, Alliance has not demonstrated that misappropriation has actually occurred or threatens to occur. Mr. Rosteck certainly had knowledge of some of this information, but it is not enough for Alliance to simply state that his use of this information is inevitable. It has the burden to establish misappropriation has actually occurred or is threatened, and it has not done so. In fact, there is no evidence that Mr. Rosteck or Advanced Perfusion used any of the alleged trade secrets nor that it has threatened such use. At least with regard to the quality tracking program, the existing facts actually demonstrate that such misappropriation is unlikely. Neither Advanced Perfusion nor Mr. Rosteck will have access to Alliance's quality tracking program once they begin per-

forming their contract with St. Elizabeth. (Tr. at 56). Moreover, recreating the exact programming would be difficult, if at all possible, and certainly not inevitable given that programs that perform similar functions could be acquired independently. (Tr. at 56–58). Therefore, Alliance is not substantially likely to prevail on its claim of misappropriation of trade secrets.

4. *Count IV: Tortious Interference with Contract and Business Relationship (Defendants Rosteck and Advanced Perfusion)*

▮ Ohio law recognizes both the tort of intentional interference with a contract and the tort of intentional interference with a prospective contractual relationship. *Gray–Jones v. Jones,* 137 Ohio App.3d 93, 100, 738 N.E.2d 64 (2000). These torts generally occur "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another, or not to perform a contract with another." *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1, 14, 651 N.E.2d 1283 (1995). However, since Alliance's contract with St. Elizabeth had expired prior to when the alleged interference by the defendants occurred, this Court views plaintiff's claim solely as one of tortious interference with a prospective business relationship. An entity is subject to liability for the tort of intentional interference with a prospective business relationship if the interference consists of:

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or

(b) preventing the other from acquiring or continuing the prospective relation.

*Gray–Jones,* 137 Ohio App.3d at 100–101, 738 N.E.2d 64 (citing Restatement of Torts (Second) § 766B).

▮ In determining whether an entity has acted improperly in intentionally interfering with the prospective contract of another, Ohio considers the following factors:

(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Fred Siegel Co., L.P.A. v. Arter & Hadden,* 85 Ohio St.3d 171, 178–79, 707 N.E.2d 853 (adopting Restatement of Torts (Second) § 767). Moreover, Ohio has also adopted the "privilege of fair competition" as set forth in Section 768 of the Restatement. *Fred Siegel,* 85 Ohio St.3d at 179–80, 707 N.E.2d 853. This privilege will defeat a claim of tortious interference with prospective contractual relationship if:

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

Restatement of Torts (Second) § 768(1) and cmt. a.

Alliance claims that Rosteck tortiously interfered with Alliance's prospective contract with St. Elizabeth when he and Advanced Perfusion obtained a contract with St. Elizabeth. In September 2002, Alliance made one proposal to St. Elizabeth to obtain a new perfusion services contract and held one meeting regarding that pro-

posal. When Advanced Perfusion was formed on 27 March 2003 and negotiations between it and St. Elizabeth began, it had been six months since any actual discussions had taken place regarding Alliance's proposal. Even if Alliance had a prospective contractual relationship with St. Elizabeth, it has not demonstrated that, based on the factors outlined above, defendants interference was improper. Given the uncertain applicability of Mr. Rosteck's noncompete clauses, it is certainly possible that Mr. Rosteck and Advanced Perfusion actions were simply competing for St. Elizabeth's business and therefore protected by the "privilege of fair competition." In any case, on the basis of the facts presented, Alliance is not substantially likely to prevail on its claim for tortious interference with its prospective contractual relationship.

5. *Count V: Breach of Duty of Loyalty and Fiduciary*

■■■■ Ohio courts have concluded that an employee "owes his or her employer a duty to act 'in the utmost good faith and loyalty toward his ... employer.'" *Berge v. Columbus Community Cable Access*, 136 Ohio App.3d 281, 326, 736 N.E.2d 517 (1999) (*quoting Connelly v. Balkwill*, 160 Ohio St. 430, 440, 116 N.E.2d 701 (1954)). This "duty of loyalty is breached when an employee competes with his or her employer." *See Cary Corp. v. Linder*, 19 IER Cases 1170, 2002–Ohio–6483, 2002 WL 31667316, at *6 (2002). Plaintiff is substantially likely to prevail on this claim because defendant Michael Rosteck directly competed with his employer, Alliance, by forming a corporation which sought and obtained a perfusion services contract with St. Elizabeth that was formerly held by Alliance.

**C. Irreparable Injury**

■■■ For the following reasons, this Court concludes that the plaintiff has failed to demonstrate an irreparable injury that would justify the issuance of a preliminary injunction. Alliance argues that it would be irreparably injured if defendants are not enjoined because it will have lost the perfusion services contract with St. Elizabeth and because this will encourage other employees to take similar actions jeopardizing Alliance and Fresenius contracts across the country. Alliance's suggestion concerning the risk to its other contracts absent the issuance of a preliminary injunction in this case is entirely speculative. Moreover, Alliance will not lose its contract with St. Elizabeth if no injunction is issued because, in fact, it did not have one. On the facts currently before the court, it is not at all clear that Alliance would have obtained the St. Elizabeth contract notwithstanding Mr. Rosteck and Advanced Perfusion's actions. Alliance's original contract with St. Elizabeth expired on 31 August 2002, at least seven months before Mr. Rosteck and Advanced Perfusion began their negotiations with St. Elizabeth. In addition, Alliance had not met with St. Elizabeth to discuss the possibility of a new contract since Alliance first made its proposal in September of 2002.

Moreover, any injury actually suffered by Alliance, if proven, is fully compensable by monetary damages and therefore not irreparable. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992) (noting that a harm is "not irreparable if it is fully compensable by monetary damages)." In this case, if Alliance can prove that it did indeed lose the St. Elizabeth contract as a result of defendant's wrongdoing, it would be entitled to monetary damages for their loss. These damages are readily calculable as Alliance valued the contract at $1.2 million and reported that 20% of that amount was profits. (Tr. at 46). Admittedly, the Sixth Circuit has stated that the "loss of fair competition that results from the breach of a non-competition covenant

is likely to irreparably harm an employer." *Basicomputer*, 973 F.2d at 512. However, given the precision with which damages can be measured in this case coupled with the fact that Alliance's non-competition clauses are unenforceable, no such inference should be made in this case.

 Finally, an injunction would not be appropriate in this case because the plaintiff has not demonstrated the likelihood of a future violation. The purpose of an injunction is to prevent future violations rather than remedy past harms. *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (citing *Swift & Co. v. U.S.*, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587 (1928)). The only claim that plaintiff is substantially likely to prevail on, breach of Mr. Rosteck's duty of loyalty, is a past violation. Since Mr. Rosteck is no longer subject to this duty of loyalty, the plaintiff does not need to be protected from future violations although it may be entitled to damages if it can prove Mr. Rosteck's past wrongdoing.

## D. Harm to Others

 In assessing a motion for a preliminary injunction, this Court must consider whether the preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs any irreparable harm established by the party seeking the injunction. *In re DeLorean Motor Co.*, 755 F.2d at 1229. Where harm to others exists from an injunction, the party seeking the injunction must make an even stronger showing on the other factors to justify its issuance. *Frisch's Restaurant. Inc.*, 759 F.2d at 1270. Defendants would be harmed if a preliminary injunction were issued preventing them from beginning the performance of their contract with St. Elizabeth. In fact, defendants' potential harm from being enjoined is much more tangible and serious than plaintiff's harm from its deni-

al since defendants actually have a contract with St. Elizabeth.

Moreover, although not a party, St. Elizabeth would be harmed by this injunction. St. Elizabeth had taken no action on Alliance's proposal for at least six months before ultimately deciding to contract with Advanced Perfusion. While the reasons for its decision are not in the record of this case, it has made its choice and would therefore be deleteriously affected by the issuance of an injunction. In particular, this injunction would prevent St. Elizabeth and its surgeons from working with perfusionists of their choice, with whom they had worked in the past-namely Mr. Rosteck, Diane Rosteck, and Ron Snyder. Regardless of any alleged wrongdoing on the part of Mr. Rosteck and Advanced Perfusion, there has been no suggestion of wrongdoing on the part of St. Elizabeth. In short, the harm to defendants as well as to St. Elizabeth weighs against the issuance of a preliminary injunction.

## E. Public Interest

The public interest factor does not weigh in either parties' favor. While there was some testimony on whether or not patients at St. Elizabeth would suffer from the issuance of this injunction because they would not receive seamless medical care, the evidence on this issue was inconclusive. Plaintiff also suggests that the public interest is served by the enforcement of non-compete agreements. While that may or may not be true, the non-compete agreements in this case are most likely invalid and, therefore, the public interest will not for that reason be served by the injunction.

## IV. CONCLUSION

Having applied the legal standards for a preliminary injunction to the facts of this case, this Court finds that they weigh

against the issuance of an injunction. Plaintiff is likely to prevail on only one of its claims and will not be irreparably injured in the absence of a preliminary injunction. While the public interest factor does not weigh in either party's favor, the harm to others from the issuance of the injunction is significant. While the plaintiff suggests a wide range of injunctive relief, none of it is appropriate given the facts presented to this Court. In particular, a preliminary injunction restraining Advanced Perfusion from performing its contract with St. Elizabeth is unwarranted at this time. Therefore, plaintiff's motion for a preliminary injunction is denied.

IT IS SO ORDERED.