OPINION
{¶ 1} Defendant-appellant, CompuServe Interactive Services, Inc. ("CompuServe"), appeals from the judgments of the Franklin County Court of Common Pleas granting summary judgment and awarding damages in favor of plaintiff-appellee, Central Funding, Inc. ("CFI"). For the following reasons, we reverse and remand.
 {¶ 2} In 1996, CFI entered into a "Master Lease Agreement of Terms and Conditions for Lease" ("1996 Lease") with non-party CompuServe Incorporated ("CompuServe Inc."), whereby CompuServe Inc. leased computer equipment from CFI. In 1998, while the 1996 Lease was still in effect, WorldCom, Inc. ("WorldCom") purchased the stock of CompuServe Inc. WorldCom then sold certain operating assets that had belonged to CompuServe Inc. to America Online, Inc. ("AOL"), who used the assets to equip CompuServe, an AOL subsidiary. As part of this sale, WorldCom and AOL divided the equipment that was the subject of the 1996 Lease. CFI terminated the 1996 Lease, sold a portion of the equipment to WorldCom, and leased the remaining equipment to CompuServe.
 {¶ 3} Because CompuServe elected to lease its portion of the equipment, CFI and CompuServe entered into a "Master Agreement of Terms and Conditions for Lease" on March 27, 1998 ("1998 Lease"). CFI and CompuServe used the 1996 Lease as a template for the 1998 Lease. Although some terms in the 1996 Lease differ from those in the 1998 Lease, the terms at issue in this case are identical.
 {¶ 4} The 1998 Lease incorporated two separate schedules, Schedules 003 and 004, in which the parties listed the leased equipment and specified the monthly rental amounts. Schedule 003 required that CFI lease to CompuServe the equipment listed on four attached pages for a base term of 29 months and, in return, that CompuServe pay $537,458 for the first monthly rental, and $324,150 for each of the remaining monthly rentals. Schedule 004 required that CFI lease to CompuServe the equipment listed on two attached pages for a base term of 28 months and, in return, that CompuServe pay $178,245 for each of the monthly rentals. Between the two schedules, CompuServe leased approximately 7,500 pieces of equipment and was obligated to pay $502,395 in monthly rentals.
 {¶ 5} In Section 6(e) of the 1998 Lease, the parties agreed that CompuServe had the option to purchase the leased equipment at the expiration of the base term:
As long as Lessee gives Lessor sixty (60) days written notice prior to the expiration of the base term, Lessee may, at the expiration of the Base Term, purchase any or all items of Equipment on the Equipment Schedule at fair market value. * * *
Also, in Section 6(e), the parties set forth the definition of "fair market value":
* * * Fair Market Value is mutually determined by Lessor and Lessee as the amount obtainable in a transaction between an informed and willing user (Lessee) under no compulsion to buy or lease and an informed and willing seller (Lessor) under no compulsion to sell or lease.
 {¶ 6} If CompuServe elected not to purchase the equipment, Section 6(d) required the return of the equipment and the payment of the monthly rental until the equipment was returned:
Lessee shall, at the termination of the Lease, at its expense, de-install, pack and return the Equipment to Lessor * * *. Until the return of the Equipment to Lessor, Lessee shall be obligated to pay the Base Monthly Rental and all other sums due under the Lease. * * *
 {¶ 7} The 1998 Lease terminated on January 31, 2001. Sixty days before the 1998 Lease terminated, CompuServe sent CFI written notice of CompuServe's intention to terminate the lease at the end of the base term and to purchase "certain items" of the leased equipment (the "buyout equipment") pursuant to Section 6(e). On January 25, 2001, CompuServe forwarded to CFI a list of 199 items of equipment it wished to purchase, and the parties began negotiating a purchase price for the buyout equipment.
 {¶ 8} Initially, Jack Gibbons, President of CFI, set the price for all of the leased equipment at $7,165,061, and the price for the buyout equipment at $1,016,906. Gibbons reached these purchase prices by using the computation in Attachment B to the 1998 Lease, which set forth a formula under which CompuServe could purchase the leased equipment during the lease term. The price as determined by Attachment B — the original cost of the equipment minus the present value of the lease payments accrued to the date of the purchase — ensured that CFI would receive a full return of its equity in the equipment.
 {¶ 9} CFI subsequently extended to CompuServe the option of entering into an extended lease culminating in CompuServe's ownership of all of the equipment. This second proposal lowered CFI's price to $6,224,552 for the purchase of all of the equipment.
 {¶ 10} In response to CFI's price determinations, Paige Hicks, the supervisor of AOL's Leasing Services, consulted a computer industry publication and contacted computer equipment resellers and a computer manufacturer to determine the fair market price of the leased equipment. Based upon the responses received, Hicks determined that the fair market price of the leased equipment was minimal. Therefore, CompuServe informed CFI that it was willing to pay approximately five percent of the original cost of the leased equipment. In an April 6, 2001 letter, CompuServe proposed that: (1) it pay $293,710.59, equaling five percent of the original cost, for the buyout equipment; (2) it return some equipment to CFI; and (3) the parties enter into an extended lease for the remaining 65 percent of the equipment. CFI rejected this proposal.
 {¶ 11} With neither CFI nor CompuServe happy with the other's proposals, the parties continued negotiation throughout March and April 2001. Each price CompuServe suggested for the equipment was based upon the price obtainable in the secondary market for computer equipment. CFI, on the other hand, relied only upon the methodology in Attachment B to the 1998 Lease to determine a price for the equipment. Ultimately, CompuServe's final price determination was $1,380,000 for 40 percent of the equipment, and CFI's was $3,516,765 for all of the equipment.
 {¶ 12} As Terry Billingsley, the director of AOL's Leasing Services, perceived that the negotiations were reaching an impasse, he suggested to Gibbons that each party retain an independent qualified appraiser to provide a fair market price for the equipment. Gibbons rejected this suggestion and demanded the return of all of the leased equipment.
 {¶ 13} On May 1, 2001, Gibbons arrived at CompuServe's headquarters with two moving vans to repossess the leased equipment. When CompuServe refused to release the equipment, CFI immediately filed suit against CompuServe for breach of contract, replevin and conversion. On the same day, CFI moved for an Order of Possession directing the sheriff to seize and deliver the leased equipment to CFI. In response to CFI's claim for replevin and motion for an Order of Possession, CompuServe filed a $7 million bond.[1]
 {¶ 14} Over the 11 months following the filing of the instant action, CompuServe returned the majority of the leased equipment to CFI's designated agent, Microman, Inc. By stipulation, the parties have agreed that any equipment CompuServe did not return by May 9, 2002, is lost. Microman, Inc., has resold much of the returned equipment, receiving prices comparable to five percent of the equipment's original price.
 {¶ 15} On July 3, 2001, CompuServe filed its first motion for summary judgment, arguing that the 1998 Lease was illegal because, prior to the execution of the 1998 Lease, the Ohio Secretary of State had revoked CFI's corporate charter. CFI did not dispute that the Secretary of State cancelled its articles of incorporation in 1996 for failure to pay certain franchise taxes and fees. Nor was it disputed that the Secretary of State did not reinstate the articles until 2001, after the filing of the instant action. Nevertheless, the trial court concluded that the execution of the 1998 Lease had the same effect as if the articles had never been cancelled because CFI's officers exercised a right within the scope of the articles as they existed prior to the cancellation when executing the 1998 Lease, and there was no evidence that officers had any knowledge of the cancellation. See R.C.1701.922(B)(1)(a) and (b). Therefore, the trial court denied CompuServe's motion for summary judgment.
 {¶ 16} After taking the deposition of Gibbons, CompuServe discovered that he had no actual knowledge of the articles' cancellation. CompuServe also discovered that CFI's statutory agent, who presumably would have received notice of the 1996 cancellation, had died in 1986, and CFI had not named a new statutory agent. Therefore, CompuServe filed a second motion for summary judgment, arguing that CFI was estopped from claiming that its officers had no actual knowledge of the cancellation because CFI shut itself off from notice of the cancellation by not naming a new statutory agent. Consequently, CompuServe argued that CFI could not avail itself of the protections of R.C. 1701.922(B)(1) and, thus, the 1998 Lease was illegal. Again, the trial court disagreed and denied CompuServe summary judgment.
 {¶ 17} On February 25, 2002, CompuServe filed its third motion for summary judgment, arguing that CFI breached the 1998 Lease by failing to honor its contractual obligation to sell the equipment CompuServe optioned for "fair market value." CompuServe asserted that this breach relieved it of any liability under the 1998 Lease and, thus, the trial court should grant summary judgment to CompuServe on CFI's breach of contract claim. CompuServe also argued that it was entitled to summary judgment on CFI's conversion claim because CompuServe's exercise of the option gave it equitable title to the equipment.
 {¶ 18} CFI responded with its own motion for summary judgment on March 1, 2002. In its motion, CFI argued that no contract arose from the exercise of the option because the parties could not "mutually determine" the price of the equipment. Therefore, CFI asserted that CompuServe breached Section 6(d) of the 1998 Lease by wrongfully withholding the equipment and, thus, CFI was entitled to summary judgment on its breach of contract and conversion claims.
 {¶ 19} In its decision issued May 2, 2002, the trial court agreed with CFI and held that the parties had agreed in the 1998 Lease that, if CompuServe exercised the option, the parties would "mutually determine" the price for the equipment. Because this price term was not definite or ascertainable, the trial court concluded that no contract arose from the exercise of the option. Accordingly, CompuServe was not entitled to retain the equipment and was obligated to pay the base monthly rental until the return of the equipment.
 {¶ 20} After a trial on the issue of damages, the trial court rendered judgment in favor of CFI for $10,004,516.68.
 {¶ 21} On appeal, appellant assigns the following errors:
[1.] The Trial Court Erred In Denying CompuServe's First Summary Judgment Motion As CFI Failed To Present Any Evidence On An Issue For Which it Carried the Burden of Proof.
[2.] The Trial Court Erred in Denying CompuServe's Second Summary Judgment Motion — CFI Was Estopped From Claiming Lack of Actual Knowledge.
[3.] The Trial Court Erred in Granting CFI's Cross Motion For Summary Judgment.
[4.] The Trial Court Erred in Denying CompuServe's Third Motion For Summary Judgment.
[5.] Alternatively, The Trial Court Erred In Granting Judgment As The Two Provisions Of The 1998 Lease Under Which CFI Was Awarded Damages Were Unenforceable Liquidated Damage Provisions.
 {¶ 22} CompuServe's first four assignments of error challenge the trial court's rulings on summary judgment. Appellate review of summary judgment motions is de novo. Helton v. Scioto Cty. Bd. of Commrs. (1997), 123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." Mergenthal v. Star Banc Corp. (1997), 122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State ex rel. Grady v. State Emp. Relations Bd. (1997), 78 Ohio St.3d 181, 183.
 {¶ 23} By its first assignment of error, CompuServe argues that the 1998 Lease is illegal because, at the time the parties entered into the 1998 Lease, CFI's corporate charter had been cancelled by the Ohio Secretary of State. CompuServe points out that the Secretary of State cancelled CFI's articles of incorporation for failure to pay franchise taxes on December 30, 1996. CFI's articles of incorporation were not reinstated until May 7, 2001, well after the parties entered into the 1998 Lease.
 {¶ 24} Pursuant to R.C. 5733.20, upon the cancellation of a corporation's articles of incorporation for failure to pay taxes, "all the powers, privileges, and franchises conferred upon such corporation by such articles of incorporation or by such certificate of authority shall cease." See, also, R.C. 1701.97 ("[n]o person shall exercise or attempt to exercise any rights, privileges, immunities, powers, franchises, or authority under the articles of domestic corporation after such articles have been cancelled"). However, upon reinstatement of the articles of incorporation, the exercise of any rights on behalf of the corporation during the cancellation period, including entering into and performing any contracts, has the same force and effect as if the articles had not been cancelled, if:
(a) The exercise of or an attempt to exercise the right, privilege, or franchise was within the scope of the corporation's or association's articles of incorporation that existed prior to cancellation;
(b) The officer, agent, or employee had no knowledge that the corporation's or association's articles of incorporation had been cancelled. [R.C. 1701.922(B)(1)(a) and (b).]
 {¶ 25} Importantly, R.C. 1701.922 "is to be construed liberally to accomplish the purpose of providing full reinstatement of a corporation's * * * articles of incorporation retroactive, in accordance with this section, to the time of the cancellation of the articles." R.C. 1701.922(D). Thus, construing R.C. 1701.922(B)(1) liberally, we hold that, as long as both statutory requirements are satisfied, any contract a corporation enters into during the period between the cancellation of its articles and the reinstatement of the articles is retroactively valid. See Thomas v. Price (1999), 133 Ohio App.3d 585, 590 (construing an identical provision applicable to non-profit corporations, and holding that there is "legislative intent to validate all actions of the corporation taken during the period from the cancellation of their articles to their reinstatement, as long as the two conditions set forth in subsection (B)(1) are met").
 {¶ 26} Here, the parties do not dispute that the first statutory requirement — that the execution of the 1998 Lease be within the scope of CFI's articles — was satisfied. CompuServe, however, asserts that CFI failed to establish the second requirement — that Gibbons and Joseph Franco, the CFI officers who negotiated and/or signed the 1998 Lease, had no knowledge of the cancellation of CFI's articles. Thus, CompuServe argues that the 1998 Lease is void and it is entitled to summary judgment. CompuServe's argument is unavailing because it relies upon an outdated interpretation of the summary judgment standard in which the party moving for summary judgment has no initial obligation to produce evidence showing the absence of an issue of material fact on elements of the non-moving party's claims.
 {¶ 27} When seeking summary judgment on the ground that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims. Dresher v. Burt (1996), 75 Ohio St.3d 280,293. The moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the non-moving party has no evidence to prove its case. Id.; Vahila v. Hall (1997),77 Ohio St.3d 421, 429. Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the non-moving party has no evidence to support the non-moving party's claims. Dresher, supra, at 293. Thus, because CompuServe is asserting that CFI cannot carry its burden at trial, it is CompuServe's initial burden on summary judgment to present evidence that affirmatively demonstrates that CFI is unable to establish that Gibbons and Franco were unaware of the cancellation of CFI's articles of incorporation.
 {¶ 28} In order to establish that CFI could not prove that Gibbons and Franco were ignorant of the cancellation, CompuServe included in its summary judgment motion the affidavit of Cassandra Hicks, Corporations Counsel for the Secretary of State. Hicks testified that it is the practice of the Secretary of State's office to give notice of a cancellation of a corporation's articles of incorporation to the corporation's statutory agent. If the delivery of such a notice is not completed, that fact would be noted in the corporation's records that are maintained by the Secretary of State. CFI's records, testified Hicks, contain no indication that the notice was defective.
 {¶ 29} Even if we infer from this evidence that a notice of cancellation was sent to CFI's statutory agent, we cannot conclude that CompuServe met its initial burden on summary judgment. R.C.1701.922(B)(1)(b) requires that the officer, agent, or employee who exercised any right on behalf of the corporation, such as negotiating or signing a contract, have no knowledge of the articles' cancellation. It is undisputed that CFI's statutory agent was not among those CFI officers who negotiated and signed the 1998 Lease. As previously noted, CFI's statutory agent died in 1986 and CFI failed to appoint a new statutory agent. Therefore, the fact that records from the Secretary of State's office indicating that a notice of cancellation was sent to CFI's statutory agent does not establish that Gibbons or Franco had knowledge of the cancellation. Consequently, CompuServe did not present evidence that affirmatively demonstrated the absence of a genuine issue of material fact as to the CFI's officers' knowledge of the cancellation.
 {¶ 30} Accordingly, we overrule CompuServe's first assignment of error.
 {¶ 31} By its second assignment of error, CompuServe again argues that the 1998 Lease is illegal because, at the time the parties entered into the contract, CFI's corporate charter was cancelled. CompuServe augments this argument with the assertion that CFI cannot resist summary judgment by claiming that Gibbons and Franco were ignorant of the cancellation because CFI shut itself off from receiving notice of the cancellation when it did not name a new statutory agent after its first statutory agent died. Thus, CompuServe reasons that, as CFI is estopped from claiming that its officers had no knowledge of the cancellation, there is no genuine issue of material fact as to Gibbons' and Franco's knowledge, and CompuServe is entitled to summary judgment.
 {¶ 32} When Gibbons initially filed CFI's articles of incorporation with the Secretary of State in 1976, he named C. Edward Flood as CFI's statutory agent. However, after Flood died in 1986, Gibbons, who was aware of Flood's death, did not name a new statutory agent. Therefore, when the Secretary of State sent the notice of cancellation to Flood in 1996, no one from CFI received the notice.
 {¶ 33} We agree with CompuServe that, "[a] person has no right to shut his eyes or ears to avoid information and then say he has not been given any notice." Fink v. Ohio State Liquor Control Comm. (Aug. 12, 1999), Franklin App. No. 98AP-1403. We, however, do not agree that this legal principle has application here.
 {¶ 34} As we explained above, if Gibbons and Franco had no knowledge of the cancellation of the articles, the 1998 Lease has the same force and effect as if CFI's articles were never cancelled. Thus, CompuServe's estoppel argument hinges upon the presumption that Gibbons and Franco would have known of the cancellation if CFI would have had a new statutory agent when the cancellation notice was sent. This presumption is erroneous on summary judgment. First, any information received by a corporation's statutory agent is imputed to the corporation, not to any specific officer, director, employee or agent of the corporation. Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc. (1992), 81 Ohio App.3d 591, 603 ("[i]t is well settled in Ohio that information obtained by agents within the scope of their authority during the transaction of a corporate principal's business `become at once the knowledge of the corporation without any actual or presumptive communication from agent to principal' "). Thus, the CFI's statutory agent's knowledge cannot be imputed to Gibbons or Franco.
 {¶ 35} Second, CompuServe offers only speculation, not affirmative evidence, that, if CFI had appointed a new statutory agent after Flood died, that statutory agent would have communicated the 1996 cancellation to Gibbons or Franco. CompuServe asserts that Gibbons testified that CFI's statutory agent would have provided any notice he or she received to Gibbons. In fact, Gibbons only stated that Flood would have informed him of any notice from the Secretary of State that Flood would have received from 1976 to mid-1982. Because we must construe all reasonable inferences in CFI's favor, we cannot conclude from Gibbons' testimony alone that a subsequent statutory agent also would have informed Gibbons of the notice of cancellation in 1996. Schleicher v. Alliance Corporate Resources, Inc. (Dec. 7, 1995), Franklin App. Nos. 95APE03-311 and 95APE03-312 ("for purposes of summary judgment, the trial court was bound to construe all reasonable inferences in favor of * * * the nonmoving party"). Therefore, the trial court properly denied CompuServe summary judgment.
 {¶ 36} Accordingly, we overrule CompuServe's second assignment of error.
 {¶ 37} By its third and fourth assignments of error, CompuServe argues, in part, that the trial court erred in granting summary judgment to CFI and denying summary judgment to CompuServe, on CFI's breach of contract claim. CompuServe maintains that a contract for the sale of the leased equipment at "fair market value" arose when it exercised the option contained in Section 6(e). Because CFI refused to sell the equipment at "fair market value," CompuServe argues that CFI breached that contract. This breach, CompuServe asserts, relieves CompuServe of any obligation or liability under the 1998 Lease.
 {¶ 38} An option contract consists of two independent elements: (1) an offer to buy, sell, or perform some act, which becomes a contract if properly accepted; and (2) the binding agreement to leave the offer open for a specified period of time. Aldahan v. Tansky Sales, Inc. (June 20, 2000), Franklin App. No. 99AP-651; Stuller v. Levering (Aug. 23, 1996), Knox App. No. 95-CA-26. Thus, an option is a continuing offer, as well as a unilateral contract, binding the offeror of the option. Leb v. The Hoover Co. (Dec. 28, 1982), Stark App. No. C.A. 5717. "An option to buy may be exercised by giving notice of an intention to purchase; such a notice is in effect an acceptance of the offer to sell." Rossman 
Co. v. Donaldson (Dec. 6, 1994), Franklin App. Nos. 94APE03-388, 94APE03-389 and 94APE03-695. Although the holder of the option is not required to exercise it, once the option is exercised, a bilateral contract arises between the parties to the option to perform in accordance with the option terms. 1 Williston on Contracts (Lord Rev. 1990) 726-727, Section 5:16.
 {¶ 39} Here, Section 6(e) provided that CompuServe had the option to purchase "any or all items of Equipment at fair market value" if CompuServe provided CFI with 60 days written notice prior to the expiration of the 1998 Lease. Neither CFI nor CompuServe disputes that CompuServe properly complied with the requirements for acceptance of the option by providing timely notice that it intended to purchase "certain items" of the leased equipment. Accordingly, a contract arose between CompuServe and CFI for the sale of the buyout equipment at "fair market value."
 {¶ 40} CFI, however, argues that no contract arose from the exercise of the option because the parties could not mutually agree on a price for the equipment. CFI points to the definition of "fair market value" included in Section 6(e) and incorporated into the contract that arose from the exercise of the option, and argues that the language of that definition requires the price to be "mutually determined" between the "Lessee" and the "Lessor." Because the parties' negotiations failed to result in a price for the buyout equipment, CFI argues that it was not obligated to sell the buyout equipment to CompuServe.
 {¶ 41} In response, CompuServe argues that CFI misconstrues the contractual definition of "fair market value." Rather than require the parties to mutually agree upon the price, CompuServe alleges that the definition means that, when the parties entered into the 1998 Lease, they "mutually determined" that "fair market value" was the price determined in the open market by "an informed and willing user" under no compulsion to buy and "an informed and willing seller" under no compulsion to sell. Therefore, CompuServe asserts that a contract to purchase did arise when it exercised the option.
 {¶ 42} The construction of contracts is a matter of law. Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, paragraph one of the syllabus. When construing a contract, a court's principle objective is to ascertain and give effect to the intent of the parties. Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos. (1999),86 Ohio St.3d 270, 273. "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." Kelly v. Medical Life Ins. Co. (1987), 31 Ohio St.3d 130, paragraph one of the syllabus. A court will only consider extrinsic evidence in an effort to give effect to the parties' intentions if the language of a contract is ambiguous. Shifrin v. Forest City Ent., Inc. (1992),64 Ohio St.3d 635, 638. Contract language is ambiguous only where its meaning cannot be determined from the four corners of the contract or where the language is susceptible to two or more conflicting, but reasonable, interpretations. Covington v. Lucia, 151 Ohio App.3d 409,2003-Ohio-346, at ¶ 18.
 {¶ 43} As CFI argues, and the trial court determined, one possible interpretation of the "fair market value" definition is that CompuServe and CFI had to agree on a price before the option created any binding obligations. Absent an agreement on price, the option was of no consequence. However, if this was the intended meaning, there would have been no reason to include language referring to the price "obtainable" in a transaction between an informed and willing user under no compulsion to buy or lease and an informed and willing seller under no compulsion to sell or lease. On the other hand, as CompuServe argues, another possible interpretation is that the parties "mutually determined" the definition of "fair market value" was that price obtainable in an arms-length deal in an open market. However, if this was the intended meaning, there would have been no reason to include language in the definition suggesting that the "Lessee" and "Lessor" had to agree on price. Given these conflicting interpretations of the definition of "fair market value" and the problems associated with the language used, we conclude that this provision is ambiguous.
 {¶ 44} When contract language is ambiguous, a court must first examine parol evidence to determine the parties' intent. Cline v. Rose (1994), 96 Ohio App.3d 611, 615. However, when parol evidence cannot elucidate the parties' intent, a court must apply the secondary rule of contract construction whereby the ambiguous language is strictly construed against the drafter. Reida v. Thermal Seal, Inc., Franklin App. No. 02AP-308, 2002-Ohio-6968, at ¶ 29.
 {¶ 45} In order to clarify CompuServe's and CFI's intent, CFI offers parole evidence regarding negotiations between CFI and non-party CompuServe Inc. that occurred before they entered into the 1996 Lease. Although the definition of "fair market value" in the 1998 Lease is identical to the definition in the 1996 Lease, CFI and CompuServe did not discuss the language of the definition before entering into the 1998 Lease. Thus, the parol evidence CFI offers relates to an earlier lease with a different corporate entity. Such evidence has no significance in establishing the parties' intent regarding the 1998 Lease.
 {¶ 46} Because parol evidence does not reveal the parties' intent, we must apply the secondary rule of strict construction against the drafter. Accordingly, as Gibbons was the drafter of the ambiguous provision, it must be construed against CFI. Consequently, once CompuServe exercised the option, CFI was under a duty to sell the buyout equipment at "fair market value," the amount obtainable in an arms-length transaction in the open market by an informed and willing user under no compulsion to buy and an informed and willing seller under no compulsion to sell.
 {¶ 47} CompuServe next argues that CFI failed to act in good faith when setting the buyout equipment's "fair market value." We agree.
 {¶ 48} Pursuant to R.C. 1301.09 [UCC 1-203], every contract for the sale of goods "imposes an obligation of good faith in its performance or enforcement." Thus, because the contract that arose from the exercise of the option was for the sale of goods, i.e., computer equipment, CFI and CompuServe were obligated to act in good faith when determining the "fair market value" of the equipment. "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." R.C. 1302.01(A)(2).
 {¶ 49} Although the definition of "fair market value" does not require the parties to undertake any particular method of determining the "fair market value" of the equipment, it does require the parties to ascertain the prices of the leased equipment as sold by a disinterested and willing seller, and purchased by a disinterested and willing purchaser. CompuServe obtained pricing information from a computer industry publication, computer equipment resellers and a computer manufacturer to determine the fair market price of the equipment. Information from each of these sources revealed the price an informed and willing buyer under no compulsion to buy could obtain in the computer equipment secondary market from an informed and willing seller under no compulsion to sell. Therefore, CompuServe satisfied its duty to act in good faith in determining the equipment's "fair market value."
 {¶ 50} CFI, however, did not attempt to ascertain the equipment's "fair market value." Rather, in fixing its determination of the equipment's "fair market value," CFI solely relied upon the price formula contained in Attachment B. The prices CFI proposed bore no relation to the "fair market value" as shown by CompuServe's research or as reflected by the amounts the equipment later sold for on the open market. Consequently, as CFI refused to even consider the "fair market value" of the equipment when setting the equipment's price, CFI breached its duty of good faith.
 {¶ 51} Because a non-breaching party's duties are suspended when the other party to the contract breaches, CompuServe argues that CFI's breach released CompuServe from any obligation to return the equipment, much less pay damages for the late return of the equipment. CFI responds by arguing that, regardless of any supposed breach, Section 6(d) of the 1998 Lease required CompuServe to return the equipment and pay rent until it returned the equipment. We find both arguments unpersuasive.
 {¶ 52} As we concluded above, once CompuServe exercised the option, a binding, bilateral contract arose between CompuServe and CFI for the sale of the buyout equipment at "fair market value." Accordingly, CFI's obligation to sell the buyout equipment for "fair market value" stems from the contract that arose out of the option, not the 1998 Lease. Thus, by failing to use good faith in the sale of the equipment for "fair market value," CFI breached the contract that arose from the exercise of the option, not the 1998 Lease.
 {¶ 53} Moreover, the 1998 Lease no longer governs the rights of the parties with respect to the buyout equipment or the equipment not covered by the option. It is well-established law that, when an option to purchase contained within a lease is exercised, the relation of lessor and lessee ceases, and that of vendor and vendee begins. Park West Village, Inc. v. Avise (Utah 1986), 714 P.2d 1137, 1141; Schwarting v. Schwarting (N.D. 1984), 354 N.W.2d 706, 708; Pittman v. Sanditen (Tex. 1982),626 S.W.2d 496, 498; Angus Hunt Ranch, Inc. v. Bowen (Wy. 1977),571 P.2d 974, 979; Cities Serv. Oil Co. v. Viering (1949), 404 Ill. 538,89 N.E.2d 392, 402; Moore v. Maes (1949), 214 S.C. 274, 52 S.E.2d 204,208; Mauzy v. Elliott (1946), 146 Neb. 865, 22 N.W.2d 142, 146; Knerr v. Bradley (1884), 105 Pa. 190. After the option is exercised, "[t]he possession of the lessee becomes that of owner, and he will be entitled to such other rights as may be said to attach to his character as vendee." Mauzy, supra, at 147.
 {¶ 54} Unless the lease otherwise provides, the "lease and all its incidents, express and implied, are blotted out of existence" upon the exercise of the option to purchase. Bowen, supra, at 979; Viering, supra, at 402. See, also, Ford v. Lord (1978), 99 Idaho 580, 586 P.2d 270,274 (concluding that "by the exercise of the option the lease was terminated"); Pensacola Wine Spirits Distillers, Inc. v. Gator Distributors, Inc. (Fla.App. 1984), 448 So.2d 34, 35 ("a lease is terminated when an option to buy is exercised"). Consequently, a lessee's obligations under the lease, including the obligation to pay rent, are extinguished. Avise, supra, at 1141; Schwarting, supra, at 708-709; Rosenthal v. Shapiro (1952), 333 Mich. 302, 52 N.W.2d 859, 861; Moore, supra, at 208; Mauzy, supra, at 147; Young v. Cities Serv. Oil Co. (1976), 33 Md.App. 315, 364 A.2d 603, 606-607. In other words,
* * * After the option to purchase had been exercised, these lease agreement provisions, having fulfilled their purpose, were no longer applicable. The purchase and sale agreement became controlling. * * * [Pittman, supra, at 498.]
 {¶ 55} Although this rule of law is most often applied in the context of the lease and sale of land, it also governs the lease and sale of goods. For example, in Reliance Ins. Co. v. J.W. Burress, Inc. (1994), 247 Va. 418, 443 S.E.2d 143, the defendant agreed to lease a hydraulic excavator face shovel to Chantilly Crushed Stone, Inc., and included an option to purchase the machine in the lease agreement. Chantilly exercised the option. Three years later, the machine burst into flames during its operation, and Chantilly's insurer brought a subrogation action against the machine's manufacturer for breach of the implied warranties of merchantability and fitness for a particular use. The manufacturer argued that the statute of limitations had run and, in order to rule upon this argument, the court had to determine when a "contract for sale" arose. The court concluded "the contract was a lease until Chantilly exercised its purchase option, converting the lease into a contract for sale." Reliance Ins. Co., supra, at 145.
 {¶ 56} Similarly, other courts have held that, in the absence of a contractual provision to the contrary, once a lessee exercises an option to purchase contained in an equipment lease, the former lessee cannot be held liable for holdover rents. In Agristor Leasing v. Storley (N.S.D. 1989), 725 F. Supp. 472, the court noted that a binding executory contract for the purchase of agricultural equipment became effective on the date the option contained in the lease was exercised. Because a purchase contract was in effect and the parties included no lease provision specifying that rent was due after the option was exercised, the former lessees were under no obligation to pay rent after the purchase contract arose. See, also, Olga's Kitchen v. Papo (C.A. 6, 1987),815 F.2d 79 ("[a]ffirmation of Olga's right to exercise the option [to purchase restaurant equipment] eliminates Papo's contention that Olga's owed rent as a holdover tenant"); Prime Leasing, Inc. v. Aetna Life Ins. Co. (N.D.Ill., 1994), No. 93 C 7034, reversed on other grounds (C.A. 7, 1995), No. 95-1249 (former lessor of a telecommunications system was "not entitled to any holdover rent under the Lease because there is no question that [the former lessee] exercised its option pursuant to * * * the Lease to purchase the equipment at issue"); Prime Leasing, Inc. v. Vanderbilt Univ. (N.D.Ill., 1991), No. 90 C 6828 (same with relation to medical equipment).
 {¶ 57} Here, the option provided that "Lessee may, at the expiration of the Base Term, purchase any or all items of Equipment." The parties do not dispute that this option was properly exercised. Consequently, when the base term of the 1998 Lease expired on January 31, 2001, the contract for the sale of the buyout equipment arose and the 1998 Lease was extinguished. CompuServe's obligations under the 1998 Lease, including its duty to return the equipment and pay rent, necessarily terminated with the expiration of the 1998 Lease. Thus, the 1998 Lease does not entitle CFI to the return of the leased equipment, or damages for CompuServe's failure to return the leased equipment. Therefore, we conclude that CompuServe is entitled to summary judgment on CFI's breach of contract claim.
 {¶ 58} We recognize that the cases to which we have cited in concluding that the 1998 Lease terminated with the exercise of the option all involved the purchase of the entire lot of leased property. Here, CompuServe indicated that it only wished to purchase "certain items" from the entire lot of leased equipment. Arguably, then, the 1998 Lease could continue to govern that equipment CompuServe did not option. However, we are still led to the conclusion that the 1998 Lease cannot determine the rights of the parties with respect to any of the equipment.
 {¶ 59} In the 1998 Lease, the parties contracted for the lease of "units of personal property * * * described in the Schedule(s)." Consequently, the subject of the 1998 Lease was the entire lot of the equipment listed in Schedules 003 and 004. The Lease does not address the rights of the parties in the event CompuServe exercised the option to purchase only a portion of the equipment listed in the Schedules. Therefore, the exercise of the option for less than the entire lot of equipment materially alters the subject of the Lease. Because the Lease no longer governs the same equipment after the option is exercised, it cannot govern the rights of the parties.
 {¶ 60} Indeed, the language of Section 6(d), the provision that CFI claims CompuServe breached, illustrates that, with CompuServe's exercise of the option, the 1998 Lease can no longer govern the rights of the parties. Section 6(d) states that: "Lessee shall, at the termination of the Lease, at its expense, de-install, pack and return the Equipment to Lessor * * *. Until the return of the Equipment to Lessor, Lessee shall be obligated to pay the Base Monthly Rental." The Lease defines the term "Equipment" to mean all the equipment listed in the Schedules. As we stated above, with the exercise of the option, CompuServe became the purchaser, not the Lessee, of a portion of the equipment; namely, the buyout equipment. The parties' rights to the buyout equipment must be governed by the contract that arose from the exercise of the option, not the 1998 Lease. Consequently, because Section 6(d) of the 1998 Lease demands the return of all of the equipment, notwithstanding the fact that the buyout equipment is governed by the purchase contract, the Section is unenforceable. To hold otherwise would require this court to rewrite the 1998 Lease so that "Equipment" referred only to that equipment CompuServe did not option to purchase. This we cannot do. Gray-Jones v. Jones (2000), 137 Ohio App.3d 93, 105 ("[w]hen reviewing contract language, courts are required to give plain language its ordinary meaning and may not read language or terms into a contract").
 {¶ 61} Accordingly, we conclude that the trial court erred in granting summary judgment in CFI's favor, and denying summary judgment in CompuServe's favor, on CFI's breach of contract claim.
 {¶ 62} By its third and fourth assignments of error, CompuServe also argues that the trial court erred in granting summary judgment to CFI and denying summary judgment to CompuServe on CFI's conversion claim. Conversion "is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." Joyce v. General Motors Corp. (1990), 49 Ohio St.3d 93, 96, citing Zacchini v. Scripps-Howard Broadcasting Co. (1976), 47 Ohio St.2d 224, 226. In order to prove conversion, the plaintiff must demonstrate: (1) that it demanded the return of the property from the possessor after the possessor exercised dominion or control over the property; and (2) that the possessor refused to deliver the property to its rightful owner. Tabar v. Charlie's Towing Serv., Inc. (1994), 97 Ohio App.3d 423, 427-428.
 {¶ 63} CFI presented evidence that, on May 1, 2001, Gibbons arrived at CompuServe's offices requesting the return of all of the leased equipment. CompuServe refused to return the equipment. Although CompuServe may not have breached the 1998 Lease by retaining all of the leased equipment, CompuServe did not have any ownership rights to the equipment it did not seek to purchase. Therefore, when CFI arrived at CompuServe's offices seeking the return of the leased equipment, CompuServe converted that equipment it did not option by refusing to return it.
 {¶ 64} However, as to the buyout equipment, CompuServe's possession was "that of owner," and it was "entitled to such other rights as may be said to attach to [its] character as vendee." Mauzy, supra, at 147. Accordingly, CompuServe was not wrongfully exercising control over the equipment it optioned and did not convert that equipment.
 {¶ 65} In order to determine exactly what equipment was wrongfully retained and what equipment CompuServe could lawfully retain via its purchase contract arising from the exercise of the option, we must remand this case to the trial court. Although CompuServe alleges that it ultimately wished to purchase all of the equipment, the notice exercising the option referred only to "certain items" of equipment. The notice did not specify what specific equipment CompuServe wished to purchase. Because the phrase "certain items" cannot be determined from the four corners of the contract that arose from the option, it is ambiguous, Covington, supra, at ¶ 18, and parol evidence can be admitted to determine its meaning. Shifrin, supra, at 638.
 {¶ 66} In a January 25, 2001 e-mail, Hicks of CompuServe provided Gibbons of CFI with a list of 199 pieces of equipment "detailing the equipment AOL/CompuServe would like to purchase from CFI." However, subsequent to the January 25, 2001 e-mail, CFI and CompuServe discussed the sale or continued lease of various percentages of the equipment. Billingsley of CompuServe testified that, ultimately, the parties contemplated the sale of all of the leased equipment. This conflicting evidence creates a question of fact as to what equipment the parties intended CompuServe would purchase. Therefore, this case must be remanded to the trial court in order to determine the parties' intention.
 {¶ 67} Further, we note that "the measure of damages in a conversion action is the value of the converted property at the time it was converted." Tabar, supra, at 428. Thus, upon remand, the trial court must determine the value of the equipment CompuServe did not option in order to award damages for CompuServe's conversion of that equipment.
 {¶ 68} Accordingly, we conclude that the trial court properly granted summary judgment to CFI and properly denied summary judgment to CompuServe on that portion of CFI's conversion claim relating to equipment for which CompuServe did not exercise its option to purchase.
 {¶ 69} Based upon our rulings on CompuServe's third and fourth assignments of error, CompuServe's fifth assignment of error is overruled as moot.
 {¶ 70} For the foregoing reasons, CompuServe's first and second assignments of error are overruled. To the extent that CompuServe's third and fourth assignments of error relate to CFI's breach of contract claim, they are sustained. However, with respect to that portion of CompuServe's third and fourth assignments of error, which relate to CFI's conversion claim, they are overruled to the extent that the conversion refers to equipment for which CompuServe did not exercise its option to purchase. CompuServe's third and fourth assignments of error are sustained with respect to that portion of CFI's conversion claim relating to equipment for which CompuServe did exercise its option to purchase. The judgments of the Franklin County Court of Common Pleas granting summary judgment to CFI on its breach of contract claim and awarding damages based upon that claim are reversed, and this case is remanded to the trial court for further proceedings in accordance with law and this opinion.
Judgments sustained in part, reversed in part, and case remanded.
LAZARUS and BROWN, JJ., concur.
[1] Because CompuServe posted a bond prior to the entry of final judgment, CFI's claim for replevin was converted into a claim for conversion. America Rents v. Crowley (1991), 77 Ohio App.3d 801, 804, citing Pugh v. Calloway (1860), 10 Ohio St. 488.